NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DECOREL CORPORATION; Reliance-Illinois Corporation; and Ridgecraft
Corporation, Respondents.

No. 16383.

United States Court of Appeals
Seventh Circuit.

June 24, 1968.

Marcel Mallet-Prevost, Asst. Gen. Counsel, William Wachter, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Lawrence M. Joseph, Atty., N.L.R.B., Washington, D. C., for petitioner.

Sanford I. Wolff, Arthur Morse, William L. Sharp, Chicago, Ill., for Decorel Corp., Reliance-Illinois Corp., and Ridgecraft Corp., for respondents.

Before SCHNACKENBERG, SWYGERT, and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

The National Labor Relations Board petitions this court to enforce an order entered against the respondents, Decorel Corporation, Reliance Illinois Corporation, and Ridgecraft Corporation.[1] At issue in this review is the board's determination that Decorel engaged in certain unfair labor practices.[2] First, the Board determined that Decorel violated section 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1), by unlawfully refusing to bargain with Upholsterers International Union, AFL–CIO, acting through its agent, Picture Frame Workers, Moulding Workers & Furniture Handlers Union, Local 18–B, on April 16, August 26, and September 30, 1965. Second, the Board determined that Decorel violated section 8(a) (1) of the Act by promis-

---

1. All three corporations are affiliated businesses and, as the trial examiner found, have "common offices, ownership, control, directors, and operators and constitute a single integrated business * * * whose officers * * * formulate and administer a common labor policy for the three corporations. * * *" We will refer to all three corporations in this opinion as "Decorel."

2. The Board's decision and order are reported at 163 N.L.R.B. No. 11 (1967).

ing its employees "improved" benefits prior to a decertification election and by granting those benefits immediately upon the completion of the election.

Decorel is an Illinois corporation engaged in the manufacture of wooden picture frames and other related products in Mundelein, Illinois. In December 1964, shortly before the expiration of a contract entered into in January 1962, representatives of Decorel and local 18–B commenced negotiations for a new contract. Prior to 1960, Decorel had been part of a group of Chicago employers with whom the International and the local bargained on an industry-wide basis. After Decorel moved to Mundelein in late 1960, it no longer bargained as part of the Chicago group.

During the negotiations for the new contract, Decorel maintained that conditions in Mundelein differed enough from those in Chicago to warrant different terms in the Decorel contract than those contained in the contracts with the Chicago employers. After several preliminary meetings between the parties in December 1964,[3] a meeting was held in late January 1965 with a federal mediator, an employees' committee, and representatives of Decorel and the local.

A major issue in the negotiations concerned improved hospitalization benefits for Decorel's employees. Under the old contract, Decorel paid three per cent of the employees' gross monthly wages for those benefits.[4] The union proposed a hospitalization plan for the new contract whereby Decorel would pay four per cent. Decorel countered with a proposal to pay four and one-half per cent.[5] When the bargaining resumed between the parties on February 3, 1965 at the Federal Mediation Service, attorney Joseph M. Jacobs appeared for the first time on behalf of the local. During these negotiations which lasted three days, the single hurdle separating the parties was hospitalization benefits, since the local desired that any insurance plan agreed upon be carried by the International's insurance carrier, Occidental Life, Jacobs proposed to determine if Occidental could handle the higher benefit plan proposed by Decorel. On February 3 or 4, Jacobs contacted the International's president and a representative of Occidental. He reported back to the Decorel representatives that such an arrangement could be worked out. With this hurdle removed, the agreement was put in final form and was presented to Decorel's employees, who ratified it on February 8, 1965.[6] Thereafter, the agreement was initialed by the president of Decorel and the president of the local. The agreement was to be retroactive to January 1, 1965.

As in the previous agreements between the parties, there was a provision in the newly-negotiated agreement that, "This Agreement shall not, however, become effective until countersigned by a duly authorized officer of the International Union." Pursuant to this provision, the local forwarded the initialed

---

3. At the first meeting, Decorel's president and vice-president were told by the local that negotiations must await the conclusion of agreements among the International, the local, and the Chicago employers. At the second meeting, the local told Decorel it would have to accept a "Chicago contract." At the third meeting, the local insisted that Decorel "take what we [the local] want."

4. Payments were made by Decorel to the International's insurance carrier, Occidental Life of California. The plan was administered by the International which sent monthly billings.

5. According to the testimony of Decorel's president, toward the end of January 1965, Decorel began to fear that its employees would not be covered by the International hospitalization plan since the prior collective bargaining agreement had expired on December 31, 1964. Decorel had made a payment for the month of January 1965 to Occidental under the old plan. Allegedly, to avoid a lapse of coverage, Decorel instituted a plan with Equitable Life Insurance Company at the 4.5% rate effective February 1, 1965.

6. On February 2, 1965, approximately one-half of Decorel's employees filed a decertification petition with the Board.

agreement to the International for countersignature.

Although Jacobs had played a significant role in the negotiations which culminated in an agreement, he was not pleased with the outcome. Shortly after the employees ratified the contract, Jacobs held a meeting with the officers of the local. At that meeting, Jacobs advised the local's officers "that in my judgment * * * the contract was illegal." Jacobs also said, "The conduct of the company was such as to justify * * * filing an unfair labor practice charge." On February 15, 1965, the International filed unfair labor practice charges against Decorel. Some insight into the motive for the meeting and the charges appears from Jacobs' testimony that, "We were hoping that the employees would reject it [the contract]."

Immediately upon the ratification and initialing of the new contract, Decorel began to implement the provisions for wage raises, improved vacation benefits, and meetings of management and employees.[7] In the past, the International had delayed the countersignature of the contract until March. Not having received the signed contract in March 1965, the president of Decorel sent a letter to the secretary-treasurer of the local on April 9 in which he said: "We still have not received the contracts for Mundelein. Also, the employees have not received their hospitalization benefits. When will these be ready?" On April 13, Decorel's president received a response from Jacobs. After referring to the inquiry in Decorel's letter concerning the International's countersignature, Jacobs wrote, "In this connection, as you well know, there are matters which require discussion between the parties." He then proceeded to list three instances in which Decorel had allegedly failed to implement the terms of the new contract. Following this listing, he wrote, "I would think that an immediate meeting is required for the purpose of determining our current status."[8] Decorel responded to Jacobs' letter on April 16. After first questioning his authority to discuss "routine matters" on behalf of the local, Decorel's president concluded:

> One thing is clear. We negotiated a contract with local 18–B in good faith and its President initialed that contract. There is no need for "an early meeting * * * to clarify the situation." Returning a signed contract to us is all the clarification that is needed.[9]

In the Board's view, this response by Decorel constituted a refusal to bargain.

On May 7, 1965, Decorel and the International entered into a consent election agreement, setting May 21 as the date that the employees would vote pursuant to their decertification petition. Although Decorel communicated in writing with its employees on a number of occasions prior to the election, the examiner, in findings adopted by the Board, focused on two paragraphs of a letter dated May 13 from the company to the

7. Some of the benefits, retroactive pay increases requiring data processing adjustments and the new insurance plan requiring increased billings, could not be implemented immediately.

8. The examiner viewed Jacobs' response as follows:

[W]hen Respondents' [Decorel] President Stuart Scheyer, wrote the Local on April 9, referring to the fact that Respondents had not received the (signed) contract, Jacobs' reply of April 13, not only did not deny the existence of a contract but complained to the contrary that *Respondents were not complying* *with its terms.* * * * Thus instead of disavowing the contract, the Union was seeking to administer its terms. * * *

9. The International notified the local president on April 27, 1965 that the International president would not countersign the contract. This refusal was not immediately communicated to Decorel. On May 1 Decorel's president sent a telegram to the Regional Director in which he sought advice concerning his company's relation with the International and the local.

employees concerning the question of insurance benefits:

> In December, some employees asked for a better insurance program and we heartily agreed. We proposed a policy that was better than *any* union plan. After the union found they could not talk you or the Company into accepting their inferior Plan "B", then they offered to match the Equitable benefits through their company, with Decorel paying the premiums. BUT, there is still no evidence that they can or will.
>
> Many employees have asked what happens if the union is voted out. Then the previously offered Equitable insurance program will *immediately* be put into effect. There will be no loss of coverage.

Shortly after the election, which the union lost by a vote of 82 to 60, Decorel implemented their "Equitable insurance program." By virtue of Decorel's May 13 letter and its conduct after the election, the examiner, in findings adopted by the Board, concluded that Decorel had promised and granted "better insurance benefits if the Union were rejected," thereby interfering with the Board's election procedures and making "a fair election impossible," in violation of section 8(a) (1) of the Act.

There are two determinative issues in this review. One is whether on the record as a whole there is substantial evidence to support the finding that Decorel refused to bargain with the union on April 16, 1965. The other is whether on the record as a whole there is substantial evidence to support the finding that Decorel promised, and later implemented, a hospitalization insurance program for the purpose of influencing its

10. Because of our decision on this issue, we do not reach the other issues presented in this review, that is, whether substantial evidence supports the findings that Decorel refused to bargain with the union in violation of section 8(a) (5) and (1) on two occasions in August and September 1965.

employees to reject the union at the decertification election.[10]

### Decorel's alleged refusal to bargain on April 16, 1965

The examiner determined that a "binding" contract had been reached by the parties and that Decorel "might have insisted, if they chose, upon the proper signatures being affixed." The Board took an opposite view, saying: "As the International never signed the proposed 1965 contract, we find, contrary to the Trial Examiner, that no binding contract was ever reached by the parties." In concluding that Decorel's "summary rejection of the April 13 request for a meeting was unlawful," the Board reasoned:

> The request, * * * was for a meeting to discuss matters affecting the day-to-day relationships of the parties, and particularly the terms and conditions of employment under which the employees were then working. * * * [M]atters affecting employees' current terms and conditions of employment are matters which an employer is obligated to discuss with the reprsentative of its employees, whether or not a collective-bargaining agreement is then in effect.

An examination of the record demonstrates that Decorel met and bargained in good faith with the union throughout the period beginning in December 1964 and ending in early February 1965 when a final contract was negotiated and reduced to writing. After the contract had been ratified by the employees and initialed by the presidents of both the local and Decorel, it awaited only the countersignature of the International president. Since the International had participated in the bargaining.[11] Decorel

11. Hoffman, the International president, had given his specific approval to the hospitalization plan providing for a higher rate and had instructed Jacobs "to do the best" he could on other issues.

was justified in believing that its bargaining obligation with respect to the new contract had been satisfied and that only the formality of the International's countersignature remained. Thereafter, Decorel proceeded to implement the terms of the contract insofar as it was able to do so.

The conduct of the International and the local during and after the bargaining presents a striking contrast to that of Decorel. On February 15, 1965 the International filed a charge with the Board alleging that Decorel had refused to bargain in good faith. The only reasonable inference to be drawn from the record is that this charge was motivated by the International's dissatisfaction with the 1965 Decorel contract. This dissatisfaction sprang from two important differences between the Decorel contract and the other contracts negotiated by the International: first, the Decorel contract contained a different wage scale than that contained in the other "Chicago" contracts; second, the Decorel contract provided for higher hospitalization benefits than those in the International's hospitalization plan. Both differences were obvious potential sources of embarrassment to the International. The inference that the International's February 15 charge of bad faith bargaining against Decorel was a pretext gains credence from the fact that the International withdrew its charge on April 28, prior to the consent by both parties to a decertification election.[12]

■ In this setting, the Board's finding that Decorel unlawfully refused to bargain on April 16, 1965 is not supported by the record. The Board does not dispute that Decorel bargained in good faith during the negotiations culminating in the February 5 agreement. Instead, the Board viewed Jacobs' April 13 letter as a request "to discuss mat-ters affecting the relations of the parties, and particularly the terms and conditions under which the employees were then working" and Decorel's refusal to honor that request as unlawful. Even though, in the Board's view, no agreement existed between Decorel and the International, the Board reasoned that section 8(d) of the Act required Decorel to meet with the local and discuss "wages, hours, and other terms and conditions of employment."

Jacobs' April 13 letter mentioned three "matters which require discussion between the parties." These were the failure of Decorel to increase the payments for health insurance to the level agreed upon in the February 5 contract, the failure of Decorel to make the retroactive wage payments to the employees as agreed upon in the contract, and the alleged failure of Decorel to give "various employees" on the night crew the wage increase agreed upon in the contract.

The first two matters raised in Jacobs' letter could not reasonably be construed as a good faith request by Jacobs to discuss matters affecting the day-to-day relations of the parties. According to the evidence, Decorel made health insurance payments pursuant to monthly billings it received, and at the time of Jacobs' letter, billings reflecting the higher benefits had not yet been received. Decorel's president alluded to this fact in his April 9 letter to the secretary-treasurer of the local to which Jacobs' April 13 letter was a response. Moreover, through his role in the negotiations which led to an agreement on increased hospitalization benefits, Jacobs demonstrated a familiarity with the workings of the insurance plan. The inference is warranted, therefore, that Jacobs knew that Decorel had not received the increased billings and that it could

12. The withdrawal of the charge came on the day after the International com-municated to the local its refusal to countersign the agreement.

not make increased payments until it received increased billings.[13]

Decorel's president testified that he informed Jacobs on February 5 that it would take at least ninety days to readjust data processing procedures to enable Decorel to make the retroactive payments. Thus sixty days later, on April 13, Jacobs knew that the company was not yet able to make the retroactive payments. As a consequence, the good faith of his inquiry concerning this matter is also questionable.

Jacobs' inquiry concerning Decorel's failure to pay increased wages to "various employees" on the night crew suggests that some of the night crew employees were in fact receiving the increased wages pursuant to the February 5 contract. That contract also contained both a well-defined provision for grievance-arbitration and a provision for monthly labor-management meetings. Jacobs was intimately familiar with these two provisions in view of his testimony that he drafted their language. There was testimony that the monthly meetings had taken place in February, March, and April 1965. Since Jacobs requested that Decorel meet to discuss complete implementation of the provision for increased wages for the night crew as agreed upon in the February 5 contract, he must have known that the contract also contained detailed provisions for raising and resolving such a matter, either through a grievance or through a labor-management meeting. Instead of operating through the machinery established in the contract to inquire about the implementation of a term contained in the contract, Jacobs sought to raise this issue in a unilateral and unorthodox manner.

In view of Jacobs' expressed dissatisfaction with the February 5 contract and the fact that the other matters raised in his April 13 letter were known by him to be outside Decorel's control, the Board improperly viewed his letter as a request to bargain about day-to-day matters. Rather, the letter sought to undo the results reached through good faith collective bargaining.

We recognize that the process of good faith collective bargaining is the statutory scheme which Congress chose in an effort to supplant unrest and strife by discussion and conciliation. But good faith bargaining necessarily entails the earnest efforts of both sides to resolve a controversy. When one of the parties uses the bargaining process as a device to undo the results reached by orderly negotiation, the statutory scheme is subverted. We believe that the record here, viewed in its entirety, demonstrates such use by the International and the local.

### Decorel's alleged violation of section 8(a) (1)

Because of the prominence of the issue of hospitalization benefits in the contract negotiations, that question was raised during the period prior to the May 21, 1965 decertification election. As we previously indicated, the examiner focused on two paragraphs in Decorel's May 13 letter to its employees by which it communicated its position with respect to hospitalization benefits in the event the employees voted against the union. The trial examiner concluded that, "Respondents' [Decorel] actions in promising the better insurance benefits if the union were rejected * * * and in granting those benefits immediately following the election * * * violated Section 8(a) (1) of the Act and also improperly interfered with the Board's election procedures and made a fair election impossible." The Board adopted this conclusion.

---

13. In response to a question by the examiner as to when Decorel would make the first insurance payment under the new contract, Decorel's president said:
Until they change, until they notify us, I assume the welfare fund and then Occidental and whoever is involved, it may not change for months. Furthermore, they told us that you realize the forms are going to take time on this because it is entirely a different plan which is what we told the people, too.

494

In this review, the Board argues that Decorel promised benefits during the decertification election campaign so as to induce its employees to reject the local as their collective-bargaining representative. In support of its argument, the Board points to the fact that as soon as the employees voted against the union, the company implemented its new plan. The Board contends, "Since the Company had promised such action in the event that the Union lost the election, the evidence amply supports the * * finding that the grant of benefits was intended [in the words of the trial examiner] 'as a reward to the employees for having rejected the Union * * * and as a further inducement to employees to vote against the Union in the event a second election were directed.' "

There are two answers to the Board's contentions. In the first place, it is undisputed that the factual statements contained in the company communication are correct. In the second place, the "promises" in the communication, if they can be characterized as such, merely assured the employees that if the union lost the election, a hospitalization plan would be effected at the rate contained in the contract previously ratified by the employees. Thus the "promises" and their subsequent implementation did not vary from the provision in the contract. The employees were promised nothing more and received nothing more by voting to reject the union than they thought they already had as a result of the contract negotiated with the union.

Consequently, in view of the record considered as a whole, we do not believe that the challenged statements were either intended to have or in fact did have any influence on the employees' vote. For the foregoing reasons, we conclude that the Board's finding of a section 8(a) (1) violation is not supported by substantial evidence.

The Regional Director set aside the decertification election on the basis of the charged violation of section 8(a) (1) which we now determine to be unsupported by substantial evidence. Since the Regional Director was not warranted in taking this action, we need not reach the alleged August and September refusals to bargain found by the Board to have been in violation of section 8(a) (5) and (1).

The Board's petition to enforce its order is denied.