**WALD MANUFACTURING COMPANY, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
and
**International Union of Electrical, Radio, and Machine Workers, AFL–CIO, Intervenor.**

**INTERNATIONAL UNION OF ELECTRICAL, RADIO, AND MACHINE WORKERS, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
and
**Wald Manufacturing Company, Inc., Intervenor.**

**Nos. 19652, 19823.**

United States Court of Appeals, Sixth Circuit.

June 3, 1970.

Frank H. Stewart, Cincinnati, Ohio, Timothy J. Curtin, Thorley C. Mills, Jr., Taft, Stettinius & Hollister, Cincinnati, Ohio, on the brief, for Wald Manufacturing Co.

Nancy M. Sherman, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allen H. Feldman, Atty., N. L. R. B., Washington, D. C., on the brief, for National Labor Relations Board.

Before CELEBREZZE, McCREE and COMBS, Circuit Judges.

COMBS, Circuit Judge.

Wald Manufacturing Company, Inc., seeks review of a decision and order of the National Labor Relations Board holding that it violated Sections 8(a) (5) and (1) of the National Labor Relations Act. 29 U.S.C. § 158. The Board requests enforcement of its order reported at 176 NLRB No. 119. The union, Electrical, Radio and Machine Workers, AFL–CIO, has intervened in Wald's action. A petition for review originally filed in the District of Columbia Circuit by the union has been transferred here and made a part of these proceedings. No brief has been filed by the union.

The trial examiner found that the company had violated Sections 8(a) (5) and (1) of the Act by (1) refusing to entertain grievances because they were filed by the union on behalf of employees and by refusing to give the union results of adjustments of employees' grievances; (2) refusing to supply the union with information necessary to the proper administration of the bargaining agreement; (3) making unilateral changes in terms and conditions of employment without consulting the union; (4) dealing directly with employees rather than the union in matters appropriate for collective bargaining; (5) administering the grievance machinery set up in the bargaining agreement in bad faith; and (6) restraining and coercing employees in the exercise of their statutory rights.

The Board adopted the findings and conclusions of the trial examiner but modified his recommended order and notice. The Board's order requires the company to cease and desist from unfair labor practices, from refusing to bargain in good faith with the union, and from interfering with, restraining, or coercing its employees in the exercise of their statutory rights. Affirmatively, the company is required to bargain with the union on request and to post an appropriate notice. The notice reads in pertinent part:

"WE WILL NOT threaten employees that resort to concerted activity may lead to reprisals.

"WE WILL recognize and bargain with the International Union of Electrical, Radio and Machine Workers, AFL–CIO, as the representatives of our employees . . .

\* \* \* \* \* \*

"WE WILL furnish the union at its request, with information and data relevant to its discharge of its duties as your bargaining representative. WE WILL NOT change any rules or any other terms or conditions of em-

ployment without notice to the Union and without affording it an opportunity to bargain with us about any proposed changes.

"WE WILL enter upon bargaining negotiations at the Union's request, and we will make a good-faith effort to reach an agreement covering terms and conditions of employment. If agreement is reached, we will embody it in a signed contract. If a contract is signed, we will not engage in any conduct to prevent the lawful and effective administration and application of such contract."

The company is located in Maysville, Kentucky, where it manufactures bicycle parts and accessories. The campaign to organize the company's 300 employees was commenced in 1963. The first representation election was lost by the union and the results were set aside by agreement after charges of illegal activity were filed against Wald. A second election held on October 22, 1965, was won by the union and it was certified as bargaining representative on November 1, 1965. Bargaining negotiations resulted in a contract effective from January, 1966 until January, 1967. Negotiations for a new contract had been unsuccessful at the time of hearing before the trial examiner in June, 1968.

The organizing campaign and the two elections left a residual of bitterness and hostility between the union and the company. Each seemed determined to make life as difficult as possible for the other; each insisted that the other comply with the exact letter of the law, even to the point of harassment. Neither complied with the spirit of the Act. The trial examiner found that the original antagonism was exhibited by the company. He found substance, however, to the company's claim "that the Union constantly berated and accused it, and that the Union filed an avalanche of charges at the very opening of the contractual relationship." We agree with these findings. To borrow a phrase from the equity courts, the parties are in pari delicto.

During the first negotiations for a contract, commenced in November, 1965, an interim grievance procedure was established. No grievances were filed under the interim procedure, but on the day the union signed the bargaining agreement—March 17, 1966—it filed unfair labor practice charges covering almost every personnel action that had occurred during the preceding four months' bargaining period. Between the date the contract was signed and November, 1967, the union charged the company with 124 separate unfair labor practices. Each charge was investigated by the National Labor Relations Board; some were found to have substance but many were found to be without merit.

During the months following the signing of the contract, the union conducted an extensive handbill and newspaper campaign against the company. This campaign ostensibly was for the purpose of informing employees of their rights under the bargaining agreement. But, the union did not stop at the informational level. The onslaught loosed against the company amounted almost to a vendetta. For example, a handbill distributed March 16, 1966, proclaimed:

"CONTRACT NOW IN EFFECT!

\* \* \*

Failure of the Company to honor EVERY section of the agreement will result in immediate filing of grievances and/or placing of charges in the courts or Labor Board."

On May 5, the union warned that "Despite the hardships through lay-offs, warning notices and other actions designed to intimidate and frighten us, Local 752 News is happy to *inform the Company they are failing \* \* \*.*" The handbill concludes, "If you don't file a grievance, you are admitting you are guilty \* \* \*" and, the final admonition, "FILE THAT GRIEVANCE \* \* \*."

The July 26, 1966 issue of Local 752 News distributed to employees was headlined "NEW CHARGES FILED WITH

LABOR BOARD." It set out a list of names of employees affected by suspensions and discharges, and continued:

"Apparently the Company intends to get around to all of us eventually if we sit back and let them, WHICH WE DO NOT INTEND TO DO! . . .

"Local 752 News realizes that some people get very impatient because things seem to move so slowly. This cannot be helped, however, and is the reason the *Company and their attorneys* STALL AND DELAY *in every way they can.* They want us to get discouraged; BUT THIS WE WILL NOT DO—WHY? Because eventually they will be ordered to honor and live up to our Union Contract."

Excerpts from other handbills illustrate their inflammatory nature:

"COMPANY ATTORNEYS DELAY LAWSUITS ON GLOVES, ETC."

"JUDGE SAYS ARBITRATOR SHOULD RULE ON GLOVES AND BACK PAY . . . UNION SUITS DISMISSED . . .

Company attorneys were successful in getting the Union's lawsuits dismissed from court. But they used some highly unethical tactics to do it."

On June 27, 1966, the union ran a full-page advertisement in the local newspaper under the heading "What is Wrong at Walds?" The ad pictured a group of Wald employees and stated:

"But although we now have Seniority Protection in the contract, the Company still seeks to get rid of its older service employees and is trying to do so by putting them on unfamiliar jobs with production standards SET SO HIGH THEY CANNOT BE MAINTAINED.

\* \* \*

" . . . Being our friends and neighbors we wanted YOU TO KNOW EXACTLY WHAT IS WRONG AT WALDS!"

We look now to some of the company's derelictions. It refused to give the union the results of grievance and time study requests. It refused to consider grievances filed by the union president and stewards on behalf of other employees. It refused some requests for time studies because they were filed by employees not assigned to those jobs. It delayed in supplying the union with job descriptions. It insisted that almost every grievance be carried to its ultimate step. In response to the union's letter requesting copies of future warning notices as well as those which had been issued as far back as April 1, 1965, the company refused to supply any copies at all. (The trial examiner found that the company should have agreed to furnish copies of future warning notices.)

Whether any one of the above charges standing alone would have been sufficient to constitute a violation of the Act is a close question. The trial examiner found, however, that the company was guilty of bad faith in performance of the bargaining agreement and, with the added factor of bad faith, he found that the company was guilty of the violations heretofore enumerated.

■■ Since the finding of bad faith on the part of the company was a factor in the examiner's ultimate conclusions, it was error for him not to consider the question of bad faith by the union. The duty to bargain in good faith is a mutual obligation. 29 U.S.C. § 158(d). We said in N.L.R.B. v. Kentucky Utilities Co., 182 F.2d 810, 813 (6 Cir., 1950):

"Collective bargaining is a two-sided proposition; it does not exist unless *both* parties enter the negotiations in a good faith effort to reach a satisfactory agreement."

In N.L.R.B. v. Stevenson Brick and Block Co., 393 F.2d 234, 238 (4th Cir. 1968), it was said:

"There is, on the other hand, substantial evidence, overlooked by the Trial Examiner, suggesting that want of good faith might no less readily be ascribed to the union. \* \* \* Surely the conduct of the union cannot be completely ignored when assessing

the good or bad faith of the employer at the bargaining sessions. We perceive here no one-sided obduracy wilfully clogging agreement; responsibility for the failure appears to be attributable about equally to the two contenders."

It was also held in N.L.R.B. v. Decorel Corp., 397 F.2d 488, 492–493 (7th Cir. 1968), that good faith bargaining is a two-way street which both the company and the union are required to travel.

The trial examiner found, however, that the company was guilty of several clear violations in which bad faith was not an element. For at least ten years prior to 1966, the company had sponsored annual summer picnics and Christmas parties for employees and their families. In a 1964 speech, Wald's president warned employees, "We have picnics and we have Christmas parties. * * * The Union cannot guarantee you those * * * I am the man to decide what we have and when." In the summer of 1966, the company informed the union that it was dropping the picnic; later the Christmas party was dropped. The examiner found that the company should not have unilaterally discontinued these fringe benefits without affording the union an opportunity to discuss the matter. See N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed. 2d 230 (1962); N.L.R.B. v. Central Illinois Public Service Utility Co., 324 F.2d 916 (7th Cir. 1963); Southland Paper Mills, Inc., 161 N.L.R.B. 1077 (1966).

The trial examiner also found a Section 8(a) (5) violation as a result of the company's unilaterally promulgating a rule changing the procedures during the fifteen minute end-of-shift cleanup periods. The examiner credited the testimony of an employee that, before January 12, 1966, aprons, gloves, and goggles were rolled up as soon as they were taken off at the beginning of the cleanup period. Under the new rule, this equipment could not be rolled up until the last five minutes of the shift, after the machines and work area had been cleaned.

The grievance procedure provided for the filing of grievances with the supervisor after they had been presented to and refused by the foreman. On March 25, 1966, the union requested a list of supervisors with whom grievances could be filed; the company failed to respond to the request but posted in the plant the names of the supervisors. The trial examiner found that this amounted to a breach of the company's duty to treat the union as representative of the employees. This finding was made in light of the fact that prior to the request several grievances had been rejected by the company because they were filed with the wrong supervisor or in the wrong sequence.

On April 15, 1967, after the collective bargaining agreement had expired, several machine shop employees started to walk out when a co-worker was disciplined for whistling while at work. There was evidence that the no-whistling rule was new. The plant manager persuaded the employees to return to work and then called them to his office. He told them that the entire department had been recommended for a raise, that they should conduct themselves as individuals and not as a group, and that as individuals they could receive from two to fifteen cents per hour increase in pay. Two days later, the plant manager called these employees individually into his office and showed each one the amount of his increase that had been proposed in a letter mailed that day to the union. The company characterized these increases as merit raises which were permitted by the contract but admitted that in the past opportunity to bargain over merit increases had been given to the union. The examiner found that the union had no opportunity to bargain about the increases here because premature disclosure was made to the individual employees. Thus, a Section 8 (a) (5) refusal to bargain was found. See N.L.R.B. v. J. H. Allison & Co., 165 F.2d 766, 768 (6th Cir. 1948). The examiner also found a Section 8(a) (1) violation on these same facts since the

plant manager's statements constituted a warning that concerted activity would lead to loss of benefits.

■ Aside from the element of bad faith, there is substantial evidence to support the Board's findings of the Section 8(a) (5) and Section 8(a) (1) violations.

Enforcement of the Board's order is granted.