**ST. AGNES MEDICAL CENTER, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

District 1199C, National Union of Hospital and Health Care Employees, AFL–CIO, et al., Intervenors.

No. 88–1020.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1988.

Decided March 28, 1989.

Jacob P. Hart, Philadelphia, Pa., with whom Thomas Earl Patton and Frank C. Sabatino, Washington, D.C., were on the brief, for petitioner.

Joseph H. Bornong, Attorney, N.L.R.B. ("NLRB"), with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel, and John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent. Paul J. Spielberg, Atty., NLRB, Washington, D.C., also entered an appearance for respondent.

Miriam L. Gafni, Philadelphia, Pa., was on the brief for intervenors.

Before STARR and BUCKLEY, Circuit Judges, and THOMAS PENFIELD JACKSON,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

St. Agnes Medical Center petitions for review of an order of the National Labor Relations Board setting aside a decertification election and requiring St. Agnes to bargain with the union that had represent-

* Sitting by designation pursuant to 28 U.S.C. § 292(c).

ed its employees prior to the election. While we decline to overturn the Board's order setting aside the election, we conclude that certain of its findings of unfair labor practices are not supported by substantial evidence on the record as a whole. We also conclude that the Board failed to provide adequate justification for its bargaining order.

## I. BACKGROUND

### A. Factual Background

St. Agnes Medical Center ("St. Agnes" or "Hospital") is a nonprofit hospital located in Philadelphia. In 1982, it had a bargaining unit consisting of approximately 270 employees. Of those, about twenty were maintenance workers affiliated with Local 473 of the National Brotherhood of Firemen and Oilers ("Local 473"). The remainder were service employees belonging to District 1199C of the National Union of Hospital and Health Care Employees ("District 1199C"). In 1982, Local 473 and District 1199C (collectively, the "Union") became joint representatives of the unit and entered into a two-year collective bargaining agreement ("Agreement") with the Hospital that would expire on June 30, 1984.

In March 1984, a petition signed by 110 to 120 employees (forty to forty-five percent of the bargaining unit) was filed to decertify the Union. Two months later, the employees voted in favor of decertification by a margin of 132 to 126. Thereafter, the Hospital refused to negotiate a new collective bargaining agreement with the Union.

The Union filed a series of objections and unfair labor practice charges that were presented at three days of hearings before an administrative law judge ("ALJ") of the National Labor Relations Board ("Board" or "NLRB"). The ALJ found that the Hospital had committed a variety of unfair labor practices ("ULP's") in violation of sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1), (3) & (5) (1982). In essence, section 8(a)(1) forbids an employer from interfering with its employees' exercise of their right to organize, and be repre-

sented by, a union of their choice; section 8(a)(3) prohibits discrimination against employees as a result of their union membership or sympathies; and section 8(a)(5) requires that an employer bargain in good faith with its employees' representatives.

The ALJ recommended, *inter alia,* that the decertification election be vacated and the Hospital ordered to bargain with the Union. In a Decision and Order to which the ALJ's opinion ("ALJ Decision") was appended, the Board affirmed the ALJ and adopted his recommendations in nearly all respects. *St. Agnes Medical Center,* 287 N.L.R.B. No. 26 (Dec. 16, 1987) ("Decision and Order").

### B. The ALJ's ULP Findings

The ALJ's ULP findings may be divided into two groups: those committed prior to the expiration of the Agreement and those committed thereafter.

#### 1. *Pre-expiration ULP's*

a. Employee Carrie Porter was a Union delegate and steward. After she discussed the decertification petition with other employees and a union organizer, Hospital officials changed the time at which Porter could take her morning break and eat lunch to times when other employees would not be in the cafeteria. Her supervisor informed her that she was being watched, followed her to the bathroom for at least one day, and otherwise restricted Porter to her department until after the election. The ALJ concluded that the Hospital's actions violated sections 8(a)(1) and 8(a)(3). ALJ Decision at 25–26.

b. The ALJ found that St. Agnes had also violated sections 8(a)(1) and 8(a)(3) when its administrators suspended employee and Union delegate Ronald James for three days for allegedly distributing union literature in the Hospital cafeteria. A guard escorted him out of the building. Following the election, the Hospital reduced his suspension to an oral warning. *Id.*

c. The ALJ found that an incident involving supervisor Clyde Sams and John

Mobley, an employee in the Escort Department, constituted a coercive threat in violation of section 8(a)(1). ALJ Decision at 26. After learning that Mobley intended to distribute union literature during his lunch break, Sams advised Mobley that he would hold him responsible for any union literature he saw "around." The ALJ found that Sams had dissuaded Mobley from passing out the literature. *Id.* at 9.

d. The ALJ found that the Hospital violated section 8(a)(1) by maintaining rules that precluded the unauthorized solicitation of its employees for any purpose and forbade the distribution of nonwork-related materials without the Hospital's prior approval. ALJ Decision at 26–27, 34. The no-solicitation rule was set forth in the "Uniform Code of Rules for Employees" printed on the back of a personnel evaluation form that the Hospital gave employees each year. It states that "[u]nauthorized solicitation of employees, patients and visitors on St. Agnes Hospital premises for any purpose" shall be grounds for suspension and/or dismissal. In addition, St. Agnes' executive vice-president, Thomas Callaghan, declared in a prehearing affidavit that the Hospital did not permit the distribution of nonwork-related material without prior approval.

e. The ALJ found that two incidents constituted coercive interrogations in violation of section 8(a)(1). ALJ Decision at 32 & n. 22. In the first, supervisor Diane Plotkin summoned physical therapy aide Michelle Holmes into her office for a one-on-one meeting. Plotkin gave Holmes antiunion literature and explained why she should vote against the Union in the upcoming election. She then asked Holmes how she felt about the current state of affairs and asked her to present the Union's side of the story. Holmes expressed her displeasure with the number of meetings the Hospital had held concerning the dispute and asked if her attendance was mandatory. Plotkin told her it was.

In the second, supervisor Sandra Stanley approached nursing assistant Ethlyn Chambers at a nurses' station. Stanley placed a stack of anti-union literature in front of Chambers and instructed her to "take one . . . and distribute the rest [to] the other girls." Chambers scanned the literature and walked away. She did not distribute it.

f. A few days before the election, supervisor Diane Plotkin told a group of employees that a lawyer for the Hospital had said that "things looked good for the Hospital" and that after the election, a five-hour reduction in their work schedule would be reversed. The ALJ concluded that Plotkin's linkage of the assertion that "things looked good for the Hospital" with the statement that the hours would be restored constituted a promise of benefits predicated on the defeat of the Union in violation of section 8(a)(1). ALJ Decision at 11, 32, 34. The ALJ found support for this conclusion in a letter sent to employees immediately after the expiration of the Agreement. The letter noted that it was being written on the "first workday without the interference of a union" and stated that the Hospital was "committed to restoring the 40–hour work week as soon as feasible. . . ."

g. The ALJ found that the Hospital had violated sections 8(a)(1) and 8(a)(5) by unilaterally limiting the Union's access to the Hospital and restricting its use of a bulletin board. ALJ Decision at 29.

With respect to the Union's access to the Hospital, Article VI, par. 3 of the Agreement states that "Representatives of the UNION, after first receiving permission of the Personnel Director, shall have reasonable access to ST. AGNES for purposes of administering this Agreement." The ALJ found that prior to the filing of the decertification petition, the Union had essentially unrestricted access to the Hospital. Union business agent Pat DiDomenico, whose job was to "service the contract," visited St. Agnes without advance notice and was admitted after checking in with a security guard upon her arrival. She often went to the cafeteria to have lunch with the employees and, regardless of her destination, she frequently stopped and talked with employees along the way. The Hospital never placed any limits on the purposes for which she could enter the Hospital. After the

filing of the decertification petition and a few incidents of alleged leafletting at the Hospital, the Hospital unilaterally limited DiDomenico's access to the task of processing grievances, refused to allow her to visit with the employees, and denied two union organizers access to the Hospital on the grounds that they were not the Union's regular representatives.

With respect to the bulletin board, Article VI, par. 4 of the Agreement states that the Hospital shall provide an enclosed board for "posting notices pertaining to UNION business." The ALJ found that the Hospital violated this provision late in the decertification campaign when St. Agnes' personnel director, Edward McLaughlin, removed a Union flyer from the bulletin board and, without consultation with the Union, changed the lock so that he would have the only access to it. ALJ Decision at 29. The ALJ found support for this finding in McLaughlin's admission that he changed the lock.

h. The ALJ ruled that the Hospital's "Guidelines for Disciplinary Action," issued in February 1984, worked a substantial change in employees' sick leave benefit and absenteeism policy without notice or bargaining in violation of sections 8(a)(5) and 8(a)(1). ALJ Decision at 27.

The ALJ discerned two conflicts between the Guidelines and the Agreement. First, the ALJ found an apparent clash between provisions of the two dealing with absences. The Guidelines state that "[u]nauthorized absence of two successive days" will justify discharge of an employee, while Article IX, par. 3(I) of the Agreement provides that an employee will lose seniority if he "[i]s absent for forty-eight (48) consecutive hours without notifying ST. AGNES unless the employee presents an excuse acceptable to ST. AGNES."

Second, the ALJ found that the Guidelines' provisions regarding absenteeism were at odds with the Agreement's sick pay provisions. The Guidelines provide that five absences in a twelve-month period will justify a verbal warning, six will call for a written warning, seven will lead to a three-day suspension, and eight will justify discharge. Article XXI of the Agreement provides that an employee may earn ten days of sick pay per year.

i. Following the decertification election but prior to the expiration of the Agreement, the Hospital took the following unilateral actions with regard to matters covered by the Agreement: it removed the bulletin board, failed to remit union dues to the Union, and failed to submit contributions and associated reports to the Union's training and legal service funds. The ALJ concluded that because the Hospital took these actions without consultation with the Union, it had violated sections 8(a)(1) and 8(a)(5). ALJ Decision at 32–33.

j. A few days after the election, supervisor Diane Plotkin told a group of employees, in response to a question, that although the Hospital was going to deduct union dues from their June paychecks, the Hospital would later reimburse the employees. The ALJ found that this was in effect "a promise of benefit calculated to cause disaffection from the Union, in violation of Section 8(a)(1) of the Act." ALJ Decision at 33 n. 23.

### 2. *Post-expiration ULP's*

a. During the course of an evaluation following the expiration of the Agreement, supervisor Clyde Sams informed John Mobley that the Hospital was discontinuing the practice of seniority-based layoffs, that Mobley needed to improve his reading skills, and that he might not receive another evaluation. Mobley responded that he had enrolled in the District 1199C educational program. Sams told Mobley that the Hospital was no longer associated with the Union and that he should attend a school. Mobley later showed him the books provided by District 1199C, which Sams approved. The ALJ found that Sams' statements tended to interfere with Mobley's rights in violation of section 8(a)(1). ALJ Decision at 34 n. 24.

b. The ALJ found that immediately after the Agreement's expiration, the Hospital changed various terms and conditions of employment. The Hospital granted a five percent wage increase, repudiated the

Agreement's seniority rules and grievance procedures without notice or bargaining, and laid off employees without notice to the Union. ALJ Decision at 21–24. The ALJ concluded that the Hospital was in violation of sections 8(a)(5) and 8(a)(1) because it made these changes without consulting with the Union. *Id.* at 33.

## II. DISCUSSION

### A. Findings of Pre–Expiration ULP's

#### 1. *The National Labor Relations Act*

As noted above, the ALJ found that St. Agnes had engaged in unfair labor practices violative of sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act.

##### a. *Section 8(a)(1)*

Section 8(a)(1) provides that it shall be an unfair labor practice for an employer

to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

29 U.S.C. § 158(a)(1) (1982). Rights guaranteed employees by section 157 include the right to self-organization, to form or join unions, and to bargain collectively through representatives of their own choosing. 29 U.S.C. § 157 (1982).

■ Coercive threats by an employer regarding union activity violate section 8(a)(1). *Southwire Co. v. NLRB*, 820 F.2d 453, 457 (D.C.Cir.1987). In this context, we "recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969).

■ The protections of section 8(a)(1) also require that restrictions on union solicitation and distribution of literature be justified by an employer's legitimate concerns for workplace efficiency. *Restaurant Corp. of America v. NLRB*, 827 F.2d 799, 806 (D.C.Cir.1987). Thus a ban on union solicitation or distribution during free time or in nonworking areas is presumptively invalid. *Id., citing Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797–98, 65

S.Ct. 982, 985–86, 89 L.Ed. 1372 (1945). Conversely, an employer may validly prohibit solicitation and distribution in working areas. *Restaurant Corp.*, 827 F.2d at 806.

■ Further, an employer violates section 8(a)(1) when it coercively interrogates employees about their union activities and sympathies. *Southwire*, 820 F.2d at 456. The coerciveness of an interrogation must be judged by the totality of the circumstances, including "the background of the employer's labor relations history, the information sought, the rank of the questioner, the place and method of the questioning, and the truthfulness of the answer." *Id.*

■ An employer also violates section 8(a)(1) when it grants or promises to grant benefits for the purpose of inducing employees to vote against union representation. *St. Francis Fed'n v. NLRB*, 729 F.2d 844, 850 (D.C.Cir.1984), *citing NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). In *Viacom Cablevision*, 267 N.L.R.B. 1141 (1983), the Board found that the relevant question is whether the employer expressly or implicitly promised that wages or benefits would be increased if the Union were decertified.

##### b. *Section 8(a)(3)*

■ Section 8(a)(3) forbids an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

29 U.S.C. § 158(a)(3) (1982). Section 8(a)(3) forbids an employer from disciplining an employee on the basis of his union activities if the employer is motivated by an anti-union animus. Indeed, even where discriminatory conduct has only a "comparatively slight" effect on employee rights, "the burden is on the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." *NLRB v. Great Dane*

144

*Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967).

### c. *Section 8(a)(5)*

Section 8(a)(5) prohibits an employer from

refus[ing] to bargain collectively with the representatives of his employees.

29 U.S.C. § 158(a)(5) (1982).

■ Section 8(d) of the Act defines section 8(a)(5)'s bargaining obligation as requiring the union and the employer to "meet ... and confer in good faith with respect to wages, hours, and other terms of employment." 20 U.S.C. § 158(d) (1982). An employer violates section 8(a)(5)'s duty to bargain when it unilaterally changes the terms and conditions of employment during the pendency of an existing collective bargaining agreement. *International Bhd. of Elec. Workers v. NLRB*, 795 F.2d 150, 153 (D.C.Cir.1986).

### 2. *Our review of the pre-expiration ULP's*

■ We apply a deferential standard of review to the Board's and the ALJ's factual findings of unfair labor practices: if substantial evidence on the record as a whole supports the Board's findings, we must uphold them even if we would have reached a different conclusion had we considered the question *de novo*. *Idaho Statesman v. NLRB*, 836 F.2d 1396, 1401 (D.C.Cir.1988). Having examined the ALJ's findings of ULP's prior to expiration of the Agreement, we conclude that, except as stated below, they are supported by substantial evidence. Accordingly, those findings will be enforced essentially for the reasons set forth in the ALJ Decision. *See* 29 U.S.C. § 160(e) (1982) (empowering the Board to apply to a court of appeals for enforcement of its order).

We will not enforce the following ULP findings:

■ a. Substantial evidence does not support the ALJ's finding that supervisor Sandra Stanley coercively interrogated Ethlyn Chambers. According to Chambers' testimony, Stanley merely advised her to take a flyer for herself and distribute the rest to her co-workers. These facts evidence neither "coerciveness" nor an "interrogation." *See, e.g., Midwest Stock Exch. v. NLRB*, 635 F.2d 1255, 1268 (7th Cir.1980) (interrogations not coercive because there was "no implied or stated threat"). Indeed, the fact that Chambers ignored Stanley's request indicates the absence of coercion.

■ b. We also take issue with the ALJ's finding that the Guidelines worked a substantial change in employees' sick leave benefit and absenteeism policy. We conclude that the Guidelines were fully consistent with the relevant provisions of the Agreement. We note, as a general matter, that although many employees had certified in writing that they had been shown the Guidelines at the time they were issued in May 1985, the Union did not challenge them until more than a year later.

More specifically, we find no conflict between the provisions of the Guidelines and the Agreement dealing with absences. Both clearly state that an employee may not be away from work for two days unless the Hospital sanctions his absence. Nor do we accept the NLRB's argument that in contrast to the Agreement, the Guidelines' use of the term "unauthorized" removes post-absence discretion from the Hospital administration. The Guidelines specifically state that they are "just a guide" and are "not meant to supersede existing policies."

Nor do we find that the Guidelines' provisions regarding absenteeism necessarily conflict with the Agreement's provisions for sick pay. The Guidelines define each "absence" in such a way that if an employee is sick for two or more consecutive days, he is only charged with one absence. Thus if, during the year, an employee is absent because of sickness for two consecutive days on one occasion and for three consecutive days on another, he will only be credited with two absences although he will have received five days of sick pay. Because it appears unlikely that these provisions would conflict in practice, and because we find no evidence of a conflict in the record, we reject the ALJ's finding.

■ c. Finally, we find that substantial evidence does not support the ALJ's finding that Plotkin's statement regarding dues reimbursement constituted a violation of section 8(a)(1). As Plotkin's statement was made after the election and in response to a question, it is difficult to infer that the statement was made with the intention to turn employees against the Union.

## B. Post–Expiration Findings of ULP's

### 1. *Post-expiration threat*

■ Substantial evidence does not support the ALJ's finding that Sams coercively threatened Mobley after expiration of the Agreement in violation of section 8(a)(1). It is difficult to see how Sams' statements would have had a coercive effect; indeed, he told Mobley that the Union-supplied books were satisfactory. We fail to see how this discussion interfered with Mobley's rights under the Act.

### 2. *Post-expiration changes: the issue of good faith doubt*

The ALJ found that the Hospital made numerous post-expiration changes concerning mandatory subjects of bargaining without first notifying or consulting the Union. The validity of these findings turns on whether the Hospital reasonably held a good faith doubt as to the Union's status as the bargaining representative of a majority of the employees.

■ In the first year following its certification by the Board as a collective bargaining representative of employees, a union enjoys an irrebuttable presumption of majority support. *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1300 (D.C.Cir.1988). Thereafter, the presumption is rebuttable. *Id.* Therefore, section 8(a)(5) obligates an employer to bargain with a union only so long as the union is supported by a majority of employees. An employer may justify a refusal to bargain through a "clear, cogent and convincing" showing that it reasonably held a good faith doubt as to the union's status as representative of a majority of the employees at the time of refusal. *Id.* An employer, however, may not destroy a union's majority through unfair labor practices and then justify its refusal to bargain on the basis of the union's lack of majority support. *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 38 (D.C.Cir.1980).

■ Here, the Agreement expired June 30, 1984. Nevertheless, an employer's section 8(a)(5) duty to bargain with its employees' representative over terms and conditions of employment extends beyond expiration of the collective bargaining agreement. *Southwestern Steel & Supply, Inc. v. NLRB*, 806 F.2d 1111, 1113 (D.C.Cir.1986). An employer may not, by unilateral action, disturb the status quo concerning mandatory subjects of bargaining established by the expired collective bargaining agreement except through negotiation with the representative. *Id.*

The Hospital's unilateral changes concern mandatory subjects of bargaining, *see* 29 U.S.C. § 158(d) (wages, hours, and working conditions); *Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 725–26 (3d Cir.1978) (seniority); *Indiana & Michigan Elec. Co.*, 284 N.L.R.B. No. 7, slip op. at 5, 18–20 (May 29, 1987) (grievance procedure). Thus the Hospital's unilateral alteration violates its duty to bargain unless it reasonably held a good faith doubt concerning the Union's majority support at the time it took these actions.

■ St. Agnes claims that both the filing of the decertification petition and the results of the election provided a basis for its assertion of a good faith doubt. The ALJ rejected these contentions. With respect to the decertification petition, the ALJ noted that it was signed by "significantly less than half the unit employees." ALJ Decision at 34. With respect to the election results, he determined that the slim majority in the election, when viewed in light of the alleged unfair labor practices, "can only be viewed as the tainted results of threats, coercion, restraint and discrimination. The [Hospital's] intensive unlawful campaign caused this cited employee disaffection." *Id.*

We agree that the decertification petition cannot serve as a basis for the Hospital's assertion of a good faith doubt. This position is in accord with the Board's holding, in *Dresser Industries, Inc.*, 264 N.L.R.B. 1088, 1088–89 (1982), which reversed its earlier position, as stated in *Telautograph Corp.*, 199 N.L.R.B. 892 (1972), that an employer was prohibited from bargaining with a union while a decertification petition was pending. *Dresser Industries* held that requiring bargaining to continue during the pendency of a decertification election (which requires a petition signed by only thirty percent of a bargaining unit's members) best reconciles the union's presumption of majority status and the need for employer neutrality in a decertification campaign. Although the Hospital urges us to reject *Dresser Industries*, we find its rule to be both reasonable and within the discretion of the Board. Indeed, we have approved the principles underlying *Dresser Industries*. *See Allied Industrial Workers, Local 289 v. NLRB*, 476 F.2d 868, 881 (D.C.Cir.1973) ("The naked showing that a decertification petition has been filed, with no indication of the number of signatories or other related matters, is an insufficient basis in fact for refusing to bargain since it establishes no more than that the petition was supported by the requisite 30% 'showing of interest' ").

Whether the election results provided a sufficient basis for the Hospital's assertion of a good faith doubt is a more difficult question. We are troubled by the Board's suggestion that *no* decertification election that is later set aside as a result of an employer's "objectionable conduct" may serve as a basis for an assertion of a good faith doubt.

█ The Board, in affirming the ALJ, noted that "[d]espite the decertification election, the [Hospital] at all material times had a continuing obligation to recognize and bargain with the Union." Decision and Order at 3–4. The Board cited *Decorel Corp.*, 163 N.L.R.B. 146 (1967), *enforcement denied on other grounds*, 397 F.2d 488 (7th Cir.1968), for the statement that loss of an election by a union would not be

a fair reflection of employee desires when the election was later set aside based on the employer's objectionable conduct. *Id.* at 4 n. 4. The Hospital argues that this footnote creates a *per se* rule that good faith doubt cannot be established by the results of an election that is later set aside and that such a rule does not comport with the governing legal standards. We agree; and if the Board intended to establish such a rule, we reject it for the following reasons.

First, *Decorel Corp.* presented a very different factual situation. The employer in that case tried to claim a good faith doubt based upon a decertification election in order to justify unilateral actions taken *after* the election had been set aside by the Regional Director. 163 N.L.R.B. at 147. In contrast, the Hospital's actions here at issue occurred at least two years before the election was set aside.

█ Second, the standards for determining whether an employer can validly assert a good faith doubt and for determining whether an election should be set aside differ greatly. The Board may set aside a representation or decertification election if the "laboratory conditions" under which an election is required to be conducted are upset. *Rosewood Mfg. Co.*, 263 N.L.R.B. 420 (1982). Employer conduct that does not rise to the level of an unfair labor practice may upset these "laboratory conditions." *See Dal–Tex Optical*, 137 N.L.R.B. 1782, 1786–87 (1962). For example, an election was ordered to be set aside where two former employees appeared near the elections polls with enlarged sample ballots on their shirts with an "X" marked in the "Yes" box. *NLRB v. Carroll Contracting & Ready Mix, Inc.*, 636 F.2d 111 (5th Cir. 1981). In *Antenna Dep't West*, 266 N.L.R. B. 909, 914 (1983), *enf'd without opinion*, 738 F.2d 447 (9th Cir.1984), the Board set aside an election because a supervisor had been stationed in the polling area for ten or fifteen minutes.

█ In contrast, an employer is only precluded from asserting a good faith doubt if its unfair labor practices "significantly contribute to such a loss of majority

or to the factors upon which a doubt of such majority is based." *NLRB v. Nu–Southern Dyeing & Finishing, Inc.*, 444 F.2d 11, 16 (4th Cir.1971); *see also Hotel, Motel & Restaurant Employees v. NLRB*, 785 F.2d 796, 799 (9th Cir.1986) (existence of unfair labor practice prior to withdrawal of recognition does not necessarily mean that an employer's action is in bad faith). These differing standards prohibit application of a *per se* rule and require case-by-case consideration.

Therefore we remand for a reexamination of the Hospital's assertion of a good faith doubt in light of our winnowing of the ALJ's unfair labor practice findings. Specifically, the Board should determine whether the Hospital's pre-election unfair labor practices, which this court has determined to be supported by substantial evidence, were of a nature that would significantly undercut employee support for the Union and thus cast doubt on the validity of the election as a fair reflection of employee sentiment.

C. The Election

The Board adopted the recommendation of the ALJ and ordered that the election be set aside because of the Hospital's pre-election unfair labor practices. Decision and Order at 3. As noted above, the Board may set aside an election that was held under other than "laboratory conditions." *Rosewood Mfg. Co.*, 263 N.L.R.B. at 420. Substantial evidence supports the ALJ's conclusion that these conditions were violated; accordingly, that part of the Board's order will be enforced.

D. The Bargaining Order

█ The Board also adopted the ALJ's recommendation that St. Agnes be ordered to bargain with the Union without first conducting a rerun election to determine its majority support. This decision was based on the ALJ's conclusion that in light of the Hospital's actions, "the possibility of conducting a fair rerun election is slight." Decision and Order at 3–5. We remand the question of the bargaining order's appropriateness to the Board.

█ A bargaining order is an extreme remedy that is only appropriate in these circumstances if a fair rerun election cannot be held. *Pedro's, Inc. v. NLRB*, 652 F.2d 1005, 1011 (D.C.Cir.1981). In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–15, 89 S.Ct. 1918, 1939–41, 23 L.Ed.2d 547 (1969), the Supreme Court held that in cases in which it can be shown that a union once had majority support, the issuance of a bargaining order may be appropriate upon a finding

> that the possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies, though present, is slight and that employee sentiment ... [would be] better protected by a bargaining order.

395 U.S. at 614–15, 89 S.Ct. at 1940. The Board's traditional remedies include issuance of cease and desist orders, requiring the posting of notices, and ordering employers to reinstate employees and make financial restitution to employees or unions.

While the Court stated that the Board's choice of remedy must "be given special respect by the reviewing courts" because of the Board's expertise in gauging the effects of unfair labor practices on elections, *id.* at 612 n. 32, 89 S.Ct. at 1939 n. 32, we have joined other circuits in insisting that the Board provide specific justification for a bargaining order. In *Peoples Gas*, we stated that

> before we will enforce a bargaining order, we must be able to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representative and (3) why other remedies, less destructive to employees' rights, are not adequate.

629 F.2d at 46; *see also NLRB v. American Spring Bed Mfg. Co.*, 670 F.2d 1236, 1247 (1st Cir.1982); *NLRB v. Century Moving & Storage, Inc.*, 683 F.2d 1087, 1093 (7th Cir.1982).

We remand the question of the bargaining order for two reasons. First, we cannot find support in the record for the pattern of massive anti-union animus and actions that was invoked by the ALJ, and endorsed by the Board, as justification for imposing a bargaining order. In the ALJ's words:

> For a period covering months, Management engaged in extensive and widespread acts of threats, coercion, interference and discrimination. It repeatedly ignored its statutory bargaining obligation to the Union, flagrantly stalling and refusing to comply with clear contractual provisions and existing procedures. Management engaged in this extensive and widespread campaign in an attempt to undermine and rid itself of the Union.... The lingering effect of such massive misconduct cannot be dissipated by traditional remedies. A fair and free rerun election, under these circumstances, cannot be conducted.

ALJ Decision at 36–37. The Board concurred in the ALJ's assessment:

> We agree with the judge that a bargaining order is necessary to remedy the effects of the [Hospital's] unfair labor practices and that a fair rerun election cannot be held because of the nature and extent of the [Hospital's] unlawful conduct. The [Hospital's] illegal acts of interference, coercion, and discrimination were engaged in by high management officials over a period of several months and touched every member of the bargaining unit.

Decision and Order at 3. Upon reading the record, we do not discern the hand of a Robespierre; rather we see a decertification campaign that was vigorously contested by both sides, in the course of which the Hospital stepped over the line a number of times. The Hospital's violations were not trivial, but their cumulative impact must be reassessed, particularly in light of our disallowance of certain of the ALJ's unfair labor practice findings.

Second, the Board failed to provide the detailed analysis required by *Peoples Gas* to justify this extreme remedy. Although the Board and the ALJ both make conclusory statements that a fair rerun election cannot be held because of the Hospital's actions, Decision and Order at 5; ALJ Decision at 37, they fail to tell us why traditional remedies would not prove sufficient to assure the fairness of a rerun election. Nor are we able to discern why the Board concluded that the employees' section 7 rights are best protected by denying them the opportunity to vote on the issue of representation more than three-and-a-half years after the conduct complained of had occurred. As the Supreme Court noted in *Gissel,* "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior." 395 U.S. at 614, 89 S.Ct. at 1940.

The Board asserts that the Hospital's post-election conduct provides the principal justification for its issuance of a bargaining order. Decision and Order at 3–4. We have concluded, however, that the Board must reexamine the validity of the Hospital's claim of good faith doubt based upon the election results. Moreover, even if it is found that the Hospital had no basis for asserting such a doubt, the Board cannot rely on the mere fact of the Hospital's post-expiration 8(a)(5) violations for support of a bargaining order.

While we do not have the benefit of the Board's specific reasoning, we note an apparent inconsistency between the kind of anti-union conduct that the Board and the courts have found in the past to justify foregoing the more traditional remedies and the kinds of unfair labor practices with which St. Agnes has been charged. In this case, for example, the Board was greatly concerned with the Hospital's post-election wage increase. Decision and Order at 3–5. But in *Angelica Corp.,* 276 N.L.R.B. 617 (1985), the Board refused to issue a bargaining order even though the employer had made promises of increased benefits prior to an election and then granted them after the election had taken place. The Board stated:

> Although the Board has in some cases found that preelection promises of benefits followed by postelection grants of benefits warranted a [ ] bargaining or-

der, to the exclusion of a rerun election, those cases do not represent application of a per se remedial rule.... [T]he Board must assess the question of appropriate remedy on a case-by-case basis. *Id.* at 617, 89 S.Ct. at 1942. The Board found, in that case, that the benefits granted were not so substantial that their effects could not be erased by traditional remedies. *Id.* Such an analysis is lacking here.

In *Uniontown Hosp.*, 277 N.L.R.B. 1298 (1985), the Board refused to issue a bargaining order in a case where the employer committed numerous unfair labor practices including maintenance of an overly broad no solicitation rule, threats to discipline employees for solicitation, physical interference with leafletting, more than a dozen coercive interrogations, and threats to discharge union supporters in front of groups of employees. The Board concluded that these actions were "not the type of conduct that would linger in the minds of employees and preclude a free and uncoerced vote in the future." *Id.* at 1300. Particularly in light of our analysis of the ALJ's individual unfair labor practice findings, the Hospital's conduct would seem less egregious than that of the employer in *Uniontown Hospital. See also NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1370–72 (7th Cir.1983) (numerous unfair labor practices including firing an employee would not have had a lasting impact if a rerun election were held); *Century Moving*, 683 F.2d at 1094 (bargaining order not enforced because there was no history of anti-union animus or prior violations even though employer had committed several severe violations); *American Spring Bed*, 670 F.2d at 1247–48 (violations did not intimidate or coerce employees' free choice).

All of these cases reflect the careful assessment of relevant factors that *Peoples Gas* requires and that we have found lacking here. The Board must explicitly determine whether traditional remedies can erase the effects of the unfair labor practices and ensure a fair rerun election. If so, a bargaining order is not justified. Therefore, we remand this question to the Board for reassessment. If the Board still

concludes that a bargaining order is necessary, it must adhere to our *Peoples Gas* requirement that it explain why.

### III. CONCLUSION

We find that substantial evidence supports some of the ALJ's findings of unfair labor practices, but not others. As the findings of post-election violations were predicated on a flawed analysis of the Hospital's assertion of a good faith doubt as to the Union's majority status, these must be reviewed on remand, as must the propriety of the Board's bargaining order. Accordingly, we enforce the Board's order in part, grant the petition for review in part, vacate the bargaining order, and remand to the Board for proceedings consistent with this opinion.

*It is so ordered.*