**WILLIAMS ENTERPRISES, INC., a DIVISION OF WILLIAMS INDUSTRIES, INC., Petitioner, Cross–Respondent**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

No. 91–1072

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1991.
Decided March 3, 1992.

Lawrence T. Zimmerman, Washington, D.C., for petitioner, cross-respondent.

Karen L. Arndt, Atty., N.L.R.B., with whom Jerry M. Hunter, General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent, cross-petitioner. Paul J. Spielberg, Atty., N.L.R.B., Washington, D.C., also entered an appearance for respondent, cross-petitioner.

Before MIKVA, Chief Judge, and WALD and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Concurring opinion filed by Circuit Judge BUCKLEY.

MIKVA, Chief Judge:

Petitioner, Williams Enterprises, Inc., seeks review of a decision by the National Labor Relations Board finding that Williams, as a successor employer to Bristol Steel and Iron Works, committed unfair labor practices by refusing to bargain with Bristol's union, telling former Bristol employees that the new Williams plant would be a nonunion plant, and refusing to hire two former Bristol employees because of their union activity. Williams also challenges the Board's decision to issue a bargaining order as a remedy for the refusal to bargain violation. The Board cross-petitions for enforcement of its order.

We enforce the Board's order in part and remand in part. Sufficient evidence exists in the record to support the Board's determination that Williams was a successor employer to Bristol and, as a result, had a duty to bargain with Bristol's incumbent union, the International Association of Machinists and Aerospace Workers, AFL–CIO, Local Lodge 10. Sufficient evidence also exists to support the Board's conclusion that Williams violated section 8(a)(3) of the Act by refusing to hire Union members Bullock and Deloatch and section 8(a)(1) by informing former Bristol employees, on two separate occasions, that Williams's plant would be a nonunion plant.

We reject the Board's conclusion, however, that a phone call to a Williams official from the Union's business manager indicating only that the Union "would like ... to represent the employees of the new company" and that "he would like to have an opportunity to discuss, perhaps negotiate [with Williams officials]," was a valid request for recognition. Without a more explicit demand, that statement does not trigger a successor employer's duty to bargain. We also remand the Board's decision that the 8(a)(1) violation that occurred in August of 1987 tainted the employee petition signed in December of that year on which Williams bases its good faith doubt about the Union's majority status. The Board failed to articulate exactly why the August violation would linger in the minds of the employees and taint the December petition.

Finally, because the Board failed to explain adequately the type of remedy it intended and, if it intended a bargaining order, its reasons for issuing one, we remand for further explanation of its bargaining remedy.

## I. BACKGROUND

Williams Enterprises, Inc. operates a steel fabricating business in Richmond, Virginia, that engages primarily in steel bridge construction. In 1987, Williams entered into an agreement with Bristol Steel and Iron Works, Inc. to purchase the tangible assets of that company. Bristol fabricated structural steel essentially for use in constructing buildings. At the time of the agreement, Bristol employed 83 production employees who were represented by Local Lodge 10 of the International Association of Machinists and Aerospace Workers, AFL–CIO.

Pursuant to the purchase agreement, all work at the Bristol plant was scheduled to shut down on September 30, 1987, and all employees were to be fired at that time. On July 14, 1987, the plant manager for Bristol, John Barnes, and the plant superintendent, James Johnson, called a meeting of all Bristol employees to inform them of the purchase agreement and the plan to shut down. Barnes and Johnson told employees that all were invited to fill out applications for jobs with Williams but that none of them, including Barnes and Johnson themselves, would automatically be given jobs after the shut down. All 83 Bristol employees turned in applications.

Although there was conflicting testimony about what Barnes and Johnson did with these applications, the ALJ found the following: Initially, Barnes and Johnson rated each employee, on a scale of one to five, solely on the basis of skill. They then used these skill level ratings, along with four other criteria—job knowledge, multiple capabilities, adaptability to change, and average cost per hour (to be kept below $9.00)—to create a list of 44 employees "favored" for employment with Williams.

Shortly after the July 14 meeting announcing the shut down, the shop steward at Bristol, Gable Bullock, called Stephen Spain, the Union's business agent, and informed him that Bristol was selling its plant. Spain then called Barnes and said that he "would like for Local 10 to represent the employees of the new company." He also asked Barnes to tell a Williams official that he wanted "to have an opportunity to discuss, perhaps negotiate with [the official]." Later in September, Barnes forwarded this message to Richard Geyer, the general manager at Williams.

On August 21, 1987, Barnes and Johnson again met with Bristol employees but this time they held two separate meetings; one with the employees on the "favored for employment" list and one with the employees on the "unfavored" list. At the meeting with the favored employees, one employee asked whether Williams's new employees would be represented by a union. Barnes responded that Williams "did intend to operate the Richmond plant as a nonunion plant." Barnes later testified that he knew the company intended to operate as a non union plant because Williams officials instructed him to convey that fact to the Bristol employees.

During the month of September, Bristol began to reduce its workforce in anticipation of the September 30 shut down. By September 30, only 17 of Bristol's 83 production employees remained. Williams immediately hired these same 17 employees the following day when it took over operations at Bristol's plant. In addition, Williams kept Barnes and Johnson on as plant manager and plant superintendent. In October and November Williams continually increased the size of its production staff and by November 30, it appears that Williams hired 36 former Bristol employees, all from the list of 44 favored employees. Only eight of the favored employees remained unhired and two of the eight, Gable Bullock and Melvin Deloatch, were Union shop stewards at the Bristol plant.

By December of 1987, Williams still had not responded to Spain's suggestion that he and the company meet to discuss representation of its employees. So on December 14, the Union filed a charge with the Board

alleging violations of sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act. Barnes immediately called an employee meeting to discuss the Union's allegations. During that meeting one employee said that he did not want union representation and asked Barnes what he and other employees sharing his view could do to prevent unionization of the plant. Barnes explained that the employees could draw up a petition expressing their views but cautioned that any effort to do so would have to be on the employees' own time. Barnes received a petition in late December signed by 23 of its employees stating that they did not want to be represented by the Union.

In January of 1988, for unknown reasons, the Union withdrew its charge with the Board and again demanded recognition from Williams, this time by sending a letter to Barnes. Then, two days later, the Union refiled its charge. Williams later rejected the Union's second request for bargaining, asserting that the petition signed by a majority of its production employees created a good faith doubt as to the Union's majority status.

By February, Williams again began hiring former Bristol employees. This time, however, instead of starting with the eight unhired employees on the favored list, the company began taking employees from the unfavored list. Between February 8 and March 7, Williams hired four former Bristol employees all of whom appeared on the unfavored list even though the eight favored employees remained available for employment. At the end of February, Williams did hire two of the eight remaining favored employees but not until after it had hired some of the unfavored employees.

On April 1, 1988 Johnson, now the plant superintendent at Williams, approached an employee named Willo Wilkins and asked him whether Wilbert Wall, one of the favored but yet unhired employees, would be interested in a job. Johnson also asked Wilkins whether he thought Wall would want a union at the plant. Three days later, Wall met Johnson in his office at the

Williams plant. There Johnson explained that some employees signed a petition stating that they did not want a union and then asked Wall what he thought of the union. Johnson also gave his opinion of the Union stating that Williams "didn't have the union in there and didn't want no fence between us." Johnson then offered Wall a job, but Wall rejected the offer.

On August 9, 1988, based on the above facts, the Board issued a complaint against Williams alleging, among other things, that Williams had a duty to bargain with the Union as a successor employer and that its refusal to bargain violated section 8(a)(5) of the National Labor Relations Act. The complaint also claimed that Williams violated section 8(a)(1) of the Act by telling employees, during company meetings, that it would not have a union at the new plant and section 8(a)(3) by refusing to hire Bullock and Deloatch.

After a hearing, an Administrative Law Judge found that Williams was a successor employer to Bristol because it hired "almost exclusively former Bristol employees who were assigned to tasks which brought into play the same kinds of skills which they had learned and exercised in working for Bristol." *Williams Enter., Inc.*, 5–CA–19408, slip op. at 8 (May 22, 1989) (hereinafter *ALJ Opinion*). The ALJ held that, as a successor corporation, Williams had a duty to bargain with the Union, and its failure to do so constituted a violation of section 8(a)(5). *Id.* at 11. Furthermore, finding that the company's earlier violation of section 8(a)(1) during the August 1987 employee meeting tainted the petition signed by Williams's production employees, the ALJ rejected the company's argument that it had a good faith doubt about the Union's majority status when it refused to bargain. *Id.* at 12. The ALJ also concluded that Williams violated section 8(a)(3) by discriminating against Bullock and Deloatch on the basis of their involvement with the Union. *Id.* at 23–24. Finally, the ALJ concluded that Williams violated section 8(a)(1) during its meeting with potential employee Wall by telling him that the company did not want a union at the plant. *Id.* at 25.

The Board affirmed the ALJ's decision and, in addition to other remedies, ordered Williams to bargain with the Union and reinstate Bullock and Deloatch. *Williams Enter., Inc.*, 301 N.L.R.B. No. 19, slip op. at 3 (Jan. 16, 1991) (hereinafter *Board Decision*). Williams now petitions this court for review of the Board's order, arguing that the Board erred in its conclusion that Williams violated section 8(a)(5) by refusing to bargain with the Union. Williams claims that the July 14 phone conversation between Spain and Barnes was not a valid demand for bargaining and that, by the time there was a valid demand in February of 1988, the employee petition signed in December of 1987 created a good faith doubt as to the Union's majority status. Williams also challenges the Board's findings concerning the 8(a)(1) and 8(a)(3) violations and the Board's decision to issue a bargaining order in this case. The Board filed a cross-application for enforcement of its order.

## II. ANALYSIS

### A. *Standard of Review*

■ We must uphold the Board's factual findings, as well as its finding of an unfair labor practice, if supported by substantial evidence in the record. *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C.Cir.1988); *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980). Furthermore, the ALJ's credibility determinations, as adopted by the Board, will be upheld unless they are patently insupportable. *Creative Food Design*, 852 F.2d at 1297. If the Board finds an unfair labor practice, its choice of remedies will be given "special respect" by this court. *Peoples Gas*, 629 F.2d at 42. We do, however, examine the Board's choice of remedy to "assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act." *Id.*

### B. *Williams's Duty to Bargain with the Union*

■ In *Fall River Dyeing and Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), the Supreme Court reaffirmed the principle, first recognized in *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), that a successor employer has an obligation to bargain with its predecessor's union. The Court acknowledged that the unsettled period created during an employer transition places a union in a "peculiarly vulnerable position." *Fall River Dyeing*, 482 U.S. at 39, 107 S.Ct. at 2234. During that period, the union has no bargaining position with the new employer and is uncertain when, or even if, the new employer must bargain with it. Consequently, to preserve industrial peace, the rebuttable presumption of majority support that ordinarily accompanies a certified union applies equally in successor situations. *Id.* That presumption enables the union to develop a relationship with the successor employer while protecting its members' rights under its collective bargaining agreement with the predecessor employer. *Id.*

■ The presumption of majority support that creates a successor's duty to bargain arises, however, only when there is "substantial continuity" between the predecessor's business and that of the new employer; the new employer has hired a "substantial and representative complement" of its workforce and a majority of that workforce is composed of predecessor employees; and the incumbent union has, at some time, issued a valid bargaining demand to the new employer. *Fall River Dyeing*, 482 U.S. at 43, 47, 52, 107 S.Ct. at 2236, 2238, 2240. Williams does not challenge the ALJ's finding that a substantial continuity existed between Bristol's operations at the Richmond plant and Williams's operations there. Nor does Williams dispute the fact that, by October 15, 1987, it had hired a substantial and representative complement of its production employees, a majority of which were former Bristol employees. The only question, therefore, is whether the

Union, at some time, made a valid bargaining demand.

■ The ALJ concluded that the Union demanded recognition sometime between July 15, 1987, and September 30, 1987, because during that time Spain phoned Barnes to inform him that he "would like for Local 10 to represent the employees of the new company" and that "he would like to have an opportunity to discuss, perhaps negotiate [with Williams officials]," and Barnes later forwarded that message to Williams. *ALJ Opinion* at 9. We are not convinced, however, that Spain's phone call to Barnes constituted an unequivocal request for bargaining.

In *K & S Circuits, Inc.,* 255 N.L.R.B. 1270, 1297 (1981), the Board held that a verbal communication to a company official stating that the employees were forming a union and desired negotiations did not constitute a request for recognition and bargaining. The Board reasoned that the request did not claim majority status, did not propose a meeting date or any other method of initiating negotiations, and did not indicate how the employer was to reply or where to reply. *Id.* Similarly, in *Sheboygan Sausage Co., Inc.,* 156 N.L.R.B. 1490, 1500–01 (1966), the Board held that a telegram stating that the company's employees authorized the union to be their representative and that "the union requests recognition as agent from the [employer]" was not a demand for bargaining because, among other things, it did not explicitly request bargaining nor did it propose any meeting date or place, or any method to initiate a concrete bargaining session. The Board pointed out that those deficiencies took on particular significance in light of the fact that the union was, at the same time, taking steps to obtain an election by collecting union authorization cards. *Id.*

The July 14 telephone conversation between Spain and Barnes does not contain the elements of a proper demand under the Board's decisions in *K & S Circuits* and *Sheboygan Sausage.* Spain never expressly told Barnes that the Union was demanding recognition nor did he state that the Union represented a majority of Williams's employees—he merely stated that "he would like" for the Union to represent the employees at the new plant. Furthermore, Spain never proposed a specific meeting time or place and did not propose any method for determining such details. As in *Sheboygan Sausage,* Spain's vague statement takes on particular meaning in conjunction with the fact that, at the same time, he was collecting union authorization cards indicating that he had doubts about the Union's bargaining rights. *ALJ Opinion* at 12.

The ALJ distinguished *Sheboygan Sausage,* reasoning that the fact that Spain failed to mention that his union represented a majority of Williams's employees was "logically immaterial in a context in which a demand may be deemed to 'continue' until a majority is reached in a 'substantial and representative complement'...." *ALJ Opinion* at 9. We agree that the Union's failure to state that it represented a majority of the employees carries less significance in a successorship case, where the Union's majority status is presumed during the transition period between employers. *Fall River Dyeing,* 482 U.S. at 39, 53 n. 19, 107 S.Ct. at 2233, 2241 n. 19. But under the Board's decisions in *K & S Circuits* and *Sheboygan Sausage,* a bargaining demand, whether written or verbal, must contain more than merely a suggestion that the parties should meet to discuss representation. If a union's demand does not state its purpose explicitly, it must at least include some indicia of a demand, such as a suggested meeting place and time, proposed topics, and a method for reply. Because Spain's phone call contained none of these things, we conclude that it did not constitute an appropriate request for bargaining.

■ We are satisfied, however, that Spain's letter to Barnes, dated February 2, 1988, was a valid bargaining demand. That letter stated, in pertinent part, "we demand you bargain with us in good faith to reach a new agreement and ... we stand ready to negotiate in good faith with you for a new collective bargaining agreement at any time. A prompt reply would

be appreciated." The February letter specifically requests recognition, states that the Union was ready to negotiate at any time, and asks for a prompt reply. But because the Board never addressed whether the Union's February letter was a proper request for recognition, we remand this issue so that the Board can determine whether Spain's letter to Barnes contained the necessary elements to constitute a valid bargaining demand.

Williams argues that even if the union made a valid request for recognition, the company still would not have a duty to bargain. Williams points to the employee petition signed in December of 1987 by a majority of Williams's production employees and argues that it created a good faith doubt as to the Union's majority status, which relieved the company of any duty to bargain.

■■■■ A certified union's presumption of majority support can be rebutted through a "clear, cogent, and convincing" showing that the employer has a good faith doubt about the union's majority status. *St. Agnes Medical Ctr. v. NLRB*, 871 F.2d 137, 145 (D.C.Cir.1989); *Harley–Davidson Transp. Co. Inc.*, 273 N.L.R.B. 1531, 1532 (1985). Once a successor employer develops a good faith doubt, it is no longer obligated to recognize and bargain with the union. *Briggs Plumbingware, Inc. v. NLRB*, 877 F.2d 1282, 1288 (6th Cir.1989). A petition, signed by a majority of the successor's employees, indicating that they do not wish to be represented by the incumbent union, serves to create a good faith doubt. *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183 n. 56 (D.C.Cir.1981); *Harley–Davidson*, 273 N.L.R.B. at 1532. An employer is precluded, however, from asserting a good faith doubt based on an employee petition when the employer's unfair labor practices "significantly contribute" to the loss of majority status by undercutting the employees' support of the union. *St. Agnes*, 871 F.2d at 147.

The ALJ found that Williams's 8(a)(1) violation during the August 1987 employee meeting tainted the employee petition signed in December of that year because

the violation "created a situation where employees would tend to feel peril in refraining from signing the decertification petition." *ALJ Opinion* at 11 (internal quotation omitted). In adopting this determination, the Board added that it also relied "on the fact that, as of December 31, 1987, [Williams] had been unlawfully refusing to recognize the Union for 2–1/2 months." *Board Decision* at 3. We uphold the Board's finding that certain statements made during the August meeting between Williams officials and the favored Bristol employees constituted a violation of section 8(a)(1) of the Act. We are not satisfied, however, that the Board adequately explained its finding that the August unfair labor practice tainted the employee petition signed in December.

### 1. *The August 8(a)(1) violation*

■■■■ Ordinarily, an employer's statement that it will not have a union at its plant does not violate section 8(a)(1). *Standard Products Co.*, 281 N.L.R.B. 141 (1986), *enf'd in part*, 824 F.2d 291 (4th Cir.1987) (statement that employer "would do everything in its power to keep a union out" not a violation); *Hecks, Inc.*, 293 N.L.R.B. 1111 (1989) (statement in employee manual that "we do not want any of our employees to be represented by a Union" not a violation). A *successor employer's* statement that it will not have a union at its plant, however, does violate section 8(a)(1). *Kessel Food Markets, Inc.*, 287 N.L.R.B. 426, 429 (1987), *enf'd*, 868 F.2d 881 (6th Cir.1989). In *Kessel*, the Board recognized that, prior to its hiring decisions, a new employer does not know whether it will have a duty to recognize and bargain with the predecessor's union because it does not know whether it will hire a majority of the predecessor's employees. *Id.* Therefore, any statement that it will be nonunion "indicates to the applicants that [the employer] intends to discriminate against the [predecessor's] employees to ensure its nonunion status." *Id.*

The ALJ found that on August 21, 1987 Barnes and Johnson held a meeting with

the 44 employees on the "favored" list and during that meeting, in response to a question by one of the potential employees, Johnson stated that Williams "did intend to operate the Richmond plant as a nonunion plant." *ALJ Opinion* at 12. This statement, the ALJ concluded, was the sort of statement that indicates to employees that "any conduct by them which is not consistent with that ukase may jeopardize their employment possibilities or security." *ALJ Opinion* at 12. We find no reason to disturb that finding.

Williams argues that *Kessel* does not apply here because Barnes's statement at the August meeting did not say that Williams intended to remain nonunion "at all costs." But we do not read the Board's decision in *Kessel* to require an intention to remain nonunion at all costs. *Kessel* simply states that "[w]hen an employer tells applicants that the company will be nonunion before it hires its employees, the employer indicates to the applicants that it intends to discriminate against [them] to ensure its nonunion status." *Kessel*, 287 N.L.R.B. at 429. A successor employer need not necessarily say that it intends to remain nonunion "at all costs" to send the coercive message to potential employees.

Williams also argues that this case is more like *P.S. Elliott Services, Inc.*, 300 N.L.R.B. No. 162, slip op. at 6 (Dec. 31, 1990), where the Board held that an employer's statement to potential employees that it was "a nonunion company" was not an 8(a)(1) violation. However, in *P.S. Elliott*, the new employer knew, when it absorbed seven of the predecessor's eight employees into its workforce of approximately 175 employees, that it would never reach successor status. Therefore, as the Board in *P.S. Elliott* explained, the employer had an "objective basis" on which it could base its statement that it would remain nonunion. *Id.*

But Williams did not have an objective basis for its statement that the plant would be nonunion. Unlike the employer in *P.S. Elliott*, Williams did not know, before it made its hiring decisions, whether a majority of its production staff would be former Bristol workers. In fact, Williams acknowledges in its brief that it was apparent at the time of the August meeting that the company *would* draw a substantial majority of its workforce from the pool of former Bristol employees.

2. *The causal link between the August violation and the December petition*

█ Having determined that the statements made during the August employee meeting constituted a violation of section 8(a)(1), we must now decide whether a causal nexus existed between that unfair labor practice and the Union's loss of majority support. As we explained previously, an employer is precluded from asserting a good faith doubt based on an employee petition when the employer's unfair labor practices significantly contribute to the loss of majority status. *St. Agnes*, 871 F.2d at 147; *see also Avecor Inc. v. NLRB*, 931 F.2d 924, 934 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992) (substantial evidence must support finding that unfair labor practices had tendency to undermine majority strength). The ALJ held that Johnson's statement to the favored employees at the August 21, 1987 meeting that Williams "did intend to operate the Richmond plant as a nonunion plant" was the sort of statement that "naturally conveys to employees the notion that any conduct by them which is not consistent with that ukase may jeopardize their employment possibilities or security." *ALJ Opinion* at 12. The ALJ further found that the statement could "reasonably be thought to have had an unacceptably constraining effect upon employees who were thereafter asked to sign an antiunion petition ...." *Id.* But the ALJ never explained *why* the statement in August would linger in the minds of Williams's employees for four months and undermine the Union's support when the petition circulated in December. Furthermore, the Board offered no better explanation when it merely stated that it "would also rely" on the fact that Williams had been refusing to bargain for over two months when the petition circulated.

In previous decisions, the Board has identified several factors used in determining whether an employer's previous unfair labor practices tainted an employee petition. In *Olson Bodies, Inc.*, 206 N.L.R.B. 779, 784–85 (1973), the Board laid out a number of considerations focusing on the "nature of the [prior] unfair labor practices." Categories of unfair labor practices found to have a tainting effect were those that tended to (1) have a detrimental or lasting effect upon employees; (2) cause employee disaffection with the union; or (3) disrupt employee morale, deter their organizational activities, and discourage their membership in the union. *Id.* at 785. *See also Guerdon Indus., Inc.*, 218 N.L.R.B. 658, 661 (1975) (employee petition does not raise good faith doubt as to union's majority status where intervening unfair labor practices "affect the Union's status, cause employee disaffection, or improperly affect the bargaining relationship itself").

In *Master Slack Corp.*, 271 N.L.R.B. 78 (1984), the Board held that a causal connection exists between unfair labor practices and a union's loss of majority support where the unlawful conduct had a "meaningful impact" in bringing about employee disaffection with the union. The Board set forth four factors for determining whether unlawful conduct had a meaningful impact on employee support for the union. They include: (1) The length of time between the unfair labor practices and the employee petition; (2) the nature of the unfair labor practices, including whether they are of a nature that would cause a detrimental or lasting effect on the employees; (3) the tendency of the unfair labor practices to cause employee disaffection with the union; and (4) the effect of the unlawful conduct on the employees' morale, organizational activities, and membership in the union. *Id.* at 84.

Here, however, the Board failed to consider factors similar to those used in its previous decisions. An analysis using those factors and explaining why the unfair labor practice would have a lasting effect on the employees' view of the union might well have met the standards we set out in *St. Agnes* and *Avecor*. But because

the Board's decision contained no such explanation, we remand this case for further findings concerning the effect that the August 8(a)(1) violation had on the employee petition signed in December. We note that the Board could have considered any improper conduct that occurred prior to the signing of the employee petition provided that it adequately explained the basis for a finding that the conduct tainted the petition. But because we hold today that Williams was not obligated to bargain with the Union in October, as the Board found, we also remand for the Board to determine whether taint existed absent the October 8(a)(5) violation.

### 3. *The Bargaining Order as a Remedy*

Finally, Williams contends that the Board erred in issuing a bargaining order without offering a reasoned explanation for its decision to choose such a drastic remedy. The Board responds by arguing that "[i]t is settled that the standard remedy for a successor employer's refusal to bargain is a bargaining order." But while several Board decisions have issued a bargaining order without an explanation in cases involving a successor's refusal to bargain, *see e.g. Manna Pro Partners, L.P.*, 304 N.L.R.B. No. 104, ALJ Decision at 16 (Aug. 27, 1991); *Transportation Equipment Serv., Inc. d/b/a Bay Area Mack*, 293 N.L.R.B. 125, 134 (1989); *Richard Aguilar, d/b/a Ric's Best Auto Painting*, 248 N.L.R.B. 1028, 1042, 1044 (1980), *enf'd*, 652 F.2d 64 (9th Cir.1981); *Barrington Plaza and Tragniew Inc.*, 185 N.L.R.B. 962, 964 (1970), *enf'd in part*, 470 F.2d 669 (9th Cir.1972), we find no Board decision declaring that a bargaining order is the "standard remedy" in the successorship context let alone explaining and justifying the basis for such a rule.

The Supreme Court's decision in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), held that the Board may issue a bargaining order either in "exceptional cases marked by outrageous and pervasive unfair labor practices" (Category I cases) or in "less extraordinary cases marked by less pervasive prac-

tices which nonetheless still have the tendency to undermine majority strength and impede the election process (Category II cases)." *Id.* at 613–14, 89 S.Ct. at 1939–40 (internal quotations omitted). In *Avecor*, a Category II case, we recognized that a bargaining order is not automatically entitled to enforcement. *Avecor*, 931 F.2d at 934. We held that, before issuing a bargaining order, the Board must find that (1) the union, at some time, had majority support within the bargaining unit; (2) the employer's unfair labor practice had the tendency to undermine the union's majority strength; and (3) in light of the employer's unfair labor practices, the possibility of holding a fair election is slight and the employees would be better protected by a bargaining order. *Id.* at 934. Furthermore, the third finding must be supported by a reasoned explanation. *Id.* at 934–35; *see also St. Agnes*, 871 F.2d at 148 (requiring reasoned explanation for choosing bargaining order instead of traditional remedies).

 The requirement that a bargaining order be accompanied by a reasoned explanation applies not only in election cases like *Avecor* and *St. Agnes*, but also in cases like *Peoples Gas* where an employer withdraws recognition from an incumbent union. Under *Peoples Gas*, a bargaining order does not automatically flow from an unlawful withdrawal of union recognition. *Peoples Gas*, 629 F.2d at 47. If the employer's violation is serious enough, a bargaining order might be appropriate despite concerns that the employees may not desire union representation. *Id.* This would prove true especially in a case where the employees' antiunion animus resulted from an unfair labor practice committed by the employer. *Id.* But if the employer's violation is less serious, we would be inclined to give more weight to the employees' right to decide whether they want union representation and which union they want to represent them. *Id.*

Our focus on the employees' wishes is particularly important in the context of a bargaining order because bargaining orders do more than just require bargaining

in the present. A bargaining order carries with it a "decertification bar" that requires the employer to recognize the union for a reasonable time in the future. *Gissel*, 395 U.S. at 613, 89 S.Ct. at 1939; *Peoples Gas*, 629 F.2d at 45. Consequently, once a bargaining order is enforced, the employees cannot vote to remove the union, and the employer cannot refuse to bargain on the basis of a good faith doubt about the union's majority status, until a "reasonable time" has passed.

 We note, however, that a distinction lies between a "bargaining order" as envisioned by the Supreme Court in *Gissel Packing* and a simple remedial order that, as its result, requires bargaining. A "bargaining order," with its accompanying decertification bar, precludes attempts at decertification for a reasonable time after the order is entered. This decertification bar is necessary when unfair labor practices taint the employment atmosphere so severely that fair employee choice is impossible; but it is necessary only in that narrow context. We pointed out in *Peoples Gas* that "[o]ne of the fundamental rights under the Act which the Board is charged with protecting is employees' right to choose their bargaining representative, as well as the 'right to refrain' from collective bargaining." *Peoples Gas*, 629 F.2d at 45. A bargaining order intrudes on those rights by requiring employees to accept the union as their bargaining representative now and for a reasonable time in the future. *Id.* at 45 n. 17.

 A remedial order, on the other hand, does not contain a decertification bar. It merely requires an employer to "conform his conduct to the norms set out in the Act.... *No further penalty results.*" *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 740, 81 S.Ct. 1603, 1608–09, 6 L.Ed.2d 762 (1961) (emphasis added). In the case of a successor employer who unlawfully withholds recognition, the proper remedial order would be an order requiring the employer to recognize the incumbent union; but there is no decertification bar—"no further penalty." An employer subject to a remedial order can withdraw recognition when a good

faith doubt about the union's majority status arises, and the employees can petition for decertification at any time. As a result, the strict requirements surrounding a bargaining order do not apply to a remedial order that requires the union to cease and desist from failing to recognize the incumbent union. *See Fall River Dyeing*, 482 U.S. at 51 n. 18, 107 S.Ct. at 2240 n. 18 ("[W]e assume that if [an] employer were to refuse to recognize a union [improperly] ... the Board would ... enter a remedial order ... with no collateral consequences such as a decertification bar.").

■ This leaves us with the task of determining which remedy the Board issued in this case. The ALJ's decision ordered Williams to "cease and desist" from refusing to recognize the Union. *ALJ Opinion* at 27. The "cease and desist" language in the ALJ's order appears to be a remedial order that, as its effect, would require Williams to recognize the Union. The Board, however, modified the ALJ's order "to include affirmative bargaining language." *Board Decision* at 2 n. 2. So modified, the Board's order more closely resembles the type of bargaining order that requires a full explanation under *Peoples Gas*. If the Board intended to issue a "bargaining order," with its corresponding decertification bar, then we must remand so that the Board can explain its reasons for issuing the order. In any event, we remand for the Board to further explain which remedy it intended.

## C. *The Refusal to Hire Employees Bullock and Deloatch*

We turn now to the Board's finding that Williams violated section 8(a)(3) of the Act by refusing to hire two former Bristol employees, Mr. Bullock and Mr. Deloatch. Williams argues that the Board erred in its conclusion that Williams failed to hire Bullock and Deloatch due to their union activities. Williams claims that both decisions were based on legitimate business considerations and not on an antiunion animus.

■ In hiring a new workforce, an employer violates section 8(a)(3) of the Act by discriminating against potential employ-

ees on the basis of their union membership or activities. *Spencer Foods, Inc. v. N.L.R.B.*, 768 F.2d 1463, 1475 (D.C.Cir. 1985). Because it is difficult to find direct evidence of an employer's motive, the Board may rely on circumstantial evidence in determining that an antiunion motive existed. *NLRB v. Link–Belt Co.*, 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941); *Ridgely Mfg. Co. v. NLRB*, 510 F.2d 185, 186 (D.C.Cir.1975) (per curiam). Under the Board's test in *Wright Line, A division of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1089 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), once the General Counsel offers a prima facie showing that protected conduct was a "motivating factor" in an employment decision, the burden shifts to the employer to show that the same decision would have been made absent the protected conduct. The Board's findings of discriminatory motive will be disturbed only if there is no substantial evidence in the record to support its conclusions. *Spencer Foods*, 768 F.2d at 1475. We are convinced that substantial evidence in the record exists to support the Board's conclusions that Williams failed to hire Bullock and Deloatch because of their involvement with the Union. We discuss Bullock first and then Deloatch.

Bullock was a union steward who had 20 years experience as a pipefitter with Bristol. When Barnes and Johnson rated Bristol's production employees, Bullock received a "5," the highest possible rating, and his name appeared on the list of 44 favored employees. In concluding that Williams's decision not to hire Bullock was based on anti union motives, the ALJ pointed out that Williams had offered employment to four other fitters, all with ratings of less than five, and all of whom did *not* appear on the list of favored employees, while never offering employment to Bullock. *ALJ Opinion* at 17. In fact, of the 20 former Bristol fitters available for hiring (some of the fitters quit or resigned before they were offered jobs), all but four were hired and, significantly enough, three of the four were: Bullock, a union steward,

Deloatch, a union steward, and Russell, the employee who asked about the union at the August 21 meeting (no one knows what happened to the fourth). *Id.*

We are unconvinced by Williams's argument that its decision not to hire Bullock was based on business reasons. Williams rests most of its argument on its assertion that by 1988, the list of 44 favored employees was "obsolete," as were the skill ratings assessed each former Bristol employee. Williams contends that, by that time, the company was looking for employees who worked well with others and adapted to the changing work environment at the plant, qualities that Williams claims Bullock did not possess.

But Johnson testified that in compiling the list of favored employees, he and Barnes considered adaptability to change as well as skill rating, job knowledge, multiple capabilities, and average cost per hour. *ALJ Opinion* at 16. As the ALJ concluded, by including Bullock on the list of 44 favored employees, Barnes and Johnson must have decided either that his ability to adapt to change was sufficient or that his other qualities offset his problems adapting. *Id.* at 18. We see no reason to disturb the ALJ's finding with respect to this conclusion.

Williams also points to the fact that Bullock was demoted in 1980 for refusing to do "light duty" work while recovering from a back injury to support its decision not to hire him. This, Williams argues, led to the determination that Bullock was a "malingerer" and a "generally uncooperative employee." However, the ALJ chose to believe Bullock's explanation that the demotion was a "reorganizational move." *ALJ Opinion* at 18. More important, the ALJ based his finding of an 8(a)(3) violation more on the fact that the four employees categorized as "fitters" who were hired instead of Bullock had skill ratings below him and yet somehow their other qualities, including their adaptability to change, were not strong enough to land them on the favored list. *Id.* We conclude that there is substantial evidence in the record to support the ALJ's conclusion that failing to hire Bullock was a violation of section 8(a)(3).

While Deloatch's case is closer, we find sufficient evidence in the record to support the Board's decision regarding him as well. Deloatch was a pipefitter with Bristol for 12 years. Although he received a skill rating of "4," Barnes and Johnson initially did not place him on the list of favored employees. But after a discussion with Johnson, Deloatch was included on the list.

Deloatch had a long history of absenteeism. In November of 1980 he was fired due to excessive absences, but Bristol rehired him a week later with a loss in seniority. *ALJ Opinion* at 22. Bristol again fired Deloatch in 1984 for excessive absences but after he filed a grievance, the company reinstated him with a loss of pay. Deloatch's problems with absences continued, however, and in 1986 Bristol again had to caution Deloatch that he was about to receive his third warning notice for excessive absences. *Id.* Williams now claims that this problem was the deciding factor in the company's decision not to hire Deloatch.

But the ALJ saw it differently. The ALJ observed that, even with the knowledge of Deloatch's excessive absenteeism, Johnson still chose to put Deloatch on the list of favored employees after discussing the matter with Deloatch himself. Deloatch's presence on the list signaled to the ALJ that Deloatch must have possessed some other qualities that offset his disciplinary problems. *ALJ Opinion* at 23. Therefore, the ALJ concluded that Williams failed to show that the decisions would have been made absent Deloatch's union involvement. *Id.* We find ample support in the record for this decision, and Williams offers no valid reason to disturb it. Accordingly, we uphold the Board's decision that Williams committed 8(a)(3) violations by failing to hire Bullock and Deloatch.

D. *The Remaining 8(a)(1) Violations*

We also uphold the Board's decision that Williams violated section 8(a)(1) during an interview with potential employee Wilbert Wall in April 1988. Prior to the

interview, Johnson approached a Williams employee, Willo Wilkins, and asked him whether one of the favored, but yet unhired employees, Wilbert Wall, would be interested in a job. Three days later, Wall met Johnson in his office at the Williams plant. There Johnson explained that the employees signed a petition stating that they did not want a union and then asked Wall what he thought of the Union. Johnson also gave his opinion of the Union stating that Williams "didn't have the union in there and didn't want no fence between us." *ALJ Opinion* at 25. Johnson then offered Wall a job, but Wall rejected the offer.

Interrogations about the union sympathies of employees violate section 8(a)(1) if they coerce employees in the exercise of their section 7 rights. *Southwire Co. v. NLRB*, 820 F.2d 453, 456 (D.C.Cir.1987). Statements addressed to potential employees can also violate section 8(a)(1). *Wyman–Gordon v. NLRB*, 654 F.2d 134, 146 n. 18 (1st Cir.1981). The coerciveness of an interrogation must be considered in the totality of the circumstances. *Southwire*, 820 F.2d at 456. Factors relevant in determining whether an employer's statement is coercive are the company's labor relations history, the information sought, the rank of the questioner, the place and method of questioning, and the truthfulness of the answer. *Id.*

Johnson's statement to Wall was made in a job interview in Johnson's office at the Williams plant. Therefore, Wall reasonably could have concluded that his job rested on his views of the Union. In addition, the person who made the statement was a Williams official who had hiring authority over Wall. These factors sufficiently support the Board's finding that Williams violated section 8(a)(1) by questioning Wall about his union views during the job interview.

### III. CONCLUSION

We uphold the Board's decision that Williams, as a successor employer to Bristol, had a duty to bargain with the union that represented Bristol's employees. We also uphold the Board's decision that Williams violated section 8(a)(1) by telling former Bristol employees that the new plant would be a nonunion plant and by questioning Mr. Wall during his job interview. But because the Board erred in concluding that Williams's duty to bargain arose out of the July phone conversation between Spain and Barnes, we remand so that the Board can determine when, exactly, the duty arose. We also remand the Board's decision concerning taint of the employee petition for a more thorough explanation of whether the August 8(a)(1) violation alone tainted the December employee petition and why. If the Board concludes, on remand, that the December petition was in fact tainted, it must then clearly explain the nature of the applicable remedy and its reasons for choosing that remedy.

As for Mr. Bullock and Mr. Deloatch, we uphold the Board's determination that Williams violated section 8(a)(3) by failing to hire the two former Bristol employees due to their involvement with the Union. Therefore, we enforce the Board's order with respect to that finding.

*So ordered.*

BUCKLEY, Circuit Judge, concurring:

We have rejected one of the two grounds on which the National Labor Relations Board based its decision to set aside the Williams Enterprises employees' decertification petition. Therefore, the Board must now decide whether the remark made by a Williams representative in answer to a question posed at the August 1987 meeting of prospective employees, namely, that the company "did intend to operate the Richmond plant as a nonunion plant," Joint Appendix at 5, was sufficiently prejudicial to taint the December 1987 petition. If, on remand, the Board should be of that opinion, it must then decide on the appropriate remedy to deal with Williams's subsequent refusal to bargain with the union.

As the NLRB has shown a disconcerting tendency to treat a bargaining order as a remedy of first rather than last resort, *see, e.g., Avecor, Inc. v. NLRB*, 931 F.2d 924,

938–39 (D.C.Cir.1991), I think it useful to remind the Board that "effectuating ascertainable employee free choice [is] as important a goal as deterring employer misbehavior," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969); and that an order that would preclude a union representation election (or the circulation of a decertification petition) is appropriate

> only where the unfair practices have so intimidated employees that an election, even with the full complement of traditional NLRB remedies, would not reflect their true sentiments.

*Avecor*, 931 F.2d at 935. Therefore, if the Board should decide to issue such an order, it must provide a reasoned explanation of why Williams's unfair labor practices are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies." *Gissel Packing Co.*, 395 U.S. at 614, 89 S.Ct. at 1940 (internal quotation marks and citation omitted); *see also Avecor*, 931 F.2d at 937–39.