PRIME SERVICE, INC., *d/b/a* Prime Equipment, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

International Union of Operating Engineers, Local Union No 3, AFL–CIO, Intervenor for Respondent.

No. 00–1306.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 7, 2001.

Decided Oct. 12, 2001.

Harry J. Secaras argued the cause for petitioner. With him on the briefs was Howard L. Bernstein.

Steven B. Goldstein, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Julie B. Broido, Senior Attorney. Howard E. Perlstein, Deputy Assistant General Counsel, entered an appearance.

Before: HENDERSON, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Prime Service, Inc.'s petition to review and the National Labor Relations Board's cross-petition to enforce an order of the Board raise the question whether Prime Service should have been treated as a successor employer who breached its duty to bargain with the incumbent union and, if so, whether the Board's affirmative bargaining order is an appropriate remedy. Also before us is Prime's motion for an order requiring the Board to reopen the record. We deny Prime's petition and its motion and enforce the Board's order.

Prime Service, a Delaware corporation headquartered in Houston, Texas, rented and sold construction and industrial equipment. In 1998 Prime entered into an agreement to acquire the assets of Clementina, Ltd., a company in a similar line of business in California. Clementina had a

collective bargaining agreement with the Operating Engineers Local Union No. 3, International Union of Operating Engineers, AFL–CIO (the "Union"), covering seventeen employees working at its stores in San Francisco, San Mateo, Sacramento, San Jose, and Berkeley.

On August 7, 1998, Prime notified the Union that it was in the process of acquiring Clementina's assets and that it would meet with Clementina's employees to discuss the sale. In an August 11 reply, the Union requested a meeting with Prime and asserted that its collective bargaining agreement with Clementina should remain in force after the sale. Prime responded on August 13, stating that although it would consider Clementina's employees for jobs with Prime, it would not be bound by the Clementina collective bargaining agreement. The next day the Union again suggested a meeting with Prime and cautioned Prime against making any unilateral changes in the Clementina employees' terms and conditions of employment.

Sometime between August 25 and 27, Roland M. Katz, the contracts manager for the Union, and other Union representatives met with representatives of Prime, including Prime's director of human resources, regional manager, and in-house counsel. At this lunch meeting, Prime's representatives expressed the company's desire to have a "seamless transition," and stated that they were thinking of calling the acquired operation "Clementina/Prime" in order to facilitate a smooth transition. Katz stated the Union's position that Prime had to recognize Local 3 and had to continue to employ the Clementina collective bargaining unit employees. The Prime people stated that they would have to recognize the Union only if a majority of employees were former Clementina employees.

The participants also discussed potential locations for conducting negotiations. Katz told Prime's representatives that the Union always negotiated near the workplaces and suggested Alameda as a location. One of Prime's representatives proposed Houston; another suggested a location in between such as Phoenix.

Prime took over Clementina's five unionized facilities on August 28. Of Clementina's seventeen bargaining unit employees, twelve accepted Prime's offer of employment. During the next few weeks, several of the twelve employees resigned, forcing Prime to run advertisements seeking new employees. Prime also was forced to transfer temporarily employees from its other facilities. By September 25, 1998, due to resignations and Prime's hiring of additional non-Union employees, the former Clementina bargaining unit employees no longer constituted a majority of Prime's work force.

Throughout September and October, the Union repeatedly contacted Prime regarding its assurance that it would honor all legal obligations and negotiate with Local Union No. 3 if legally required to do so. When Prime refused to bargain, the Union filed an unfair labor practice charge, alleging that Prime had a duty to bargain with the Union as a successor employer and that its refusal to bargain violated the National Labor Relations Act. After a hearing, an Administrative Law Judge found that Prime had violated sections 8(a)(1) and (a)(5) of the Act, *see* 29 U.S.C. §§ 158(a)(1) and (a)(5), and recommended the issuance of a cease and desist order and an affirmative bargaining order. On March 10, 2000, the Board affirmed the ALJ's findings, and ordered Prime to bargain with the Union.

After the Board issued its order, Prime took affirmative steps on March 24, 2000, to comply by posting a "Notice to Employ-

ees." The notice informed employees that the Board had found that Prime violated the National Labor Relations Act and that Prime would not refuse to bargain with the Union as the exclusive representative of its employees. Within three weeks of the posting, fifteen of twenty-six Prime employees submitted written objections expressing their opposition to the Union's representing them. This led Prime to inform the Union that it would not proceed with collective bargaining because a majority of employees opposed Union representation.

I.

 We shall deal first with the Board's decision that Prime was a successor employer obligated to recognize and bargain with the Union. In order to preserve industrial peace during the transition between employers, the presumption of majority support ordinarily enjoyed by a certified union may continue in successor situations, thereby obligating a successor employer to bargain with its predecessor's union. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). This presumption of majority status attaches if there is a "substantial continuity" between the predecessor's business and that of the new employer; if the incumbent union has made a bargaining demand; and if the new employer has hired a "substantial and representative complement" of its work force, a majority of which consists of the predecessor's employees. *See Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1232 (D.C.Cir.1992). These are primarily factual inquiries, and to that extent the Board's judgment must be sustained if it is supported by substantial evidence. *Fall River*, 482 U.S. at 43, 107 S.Ct. 2225; *Williams*, 956 F.2d at 1232.

The parties agree that substantial continuity existed between Prime and Clementina. The dispute is whether the Union made a valid bargaining demand on Prime before August 28 and whether Prime had hired a substantial and representative complement of its work force by that date.

A. Demand

 A union need utter no particular words to convey its demand for bargaining with a successor employer. The demand may be in writing or it may be oral. Although it is customary for a union seeking recognition to inform the employer that it represents a majority of employees, even this elementary representation may be unnecessary when the successor has retained the entire workforce and hired no one else. *See Burns Int'l Sec. Servs.*, 406 U.S. at 278–79, 92 S.Ct. 1571. Still, in conveying its intentions to the successor the union must do more than simply suggest a meeting without specifying the subjects of the meeting or when or where the union would like to get together. We have held that such a vague proposal is not enough to trigger an employer's § 8(a)(5) obligation to bargain. *Williams*, 956 F.2d at 1233; *see also K & S Circuits, Inc.*, 255 N.L.R.B. 1270, 1297 (1981); *Sheboygan Sausage Co.*, 156 N.L.R.B. 1490, 1500–01 (1966). If the union does not clearly express its purpose, if it does not explicitly demand bargaining, then "some indicia of a demand, such as a suggested meeting place and time, proposed topics, and a method for reply" should be conveyed to the new employer. *Williams*, 956 F.2d at 1233. The burden is on the union to make its desires known.

For example, in *K & S Circuits*, the Board held that a union's verbal communication to a company stating that its employees were forming a union and asking to negotiate did not constitute a request

for recognition and bargaining. 255 N.L.R.B. at 1297. The Board relied on the fact that the communication "did not claim majority status, nor did it indicate how, or to whom" the company was to reply. *Id.* Similarly, in *Williams,* we held that a phone call indicating that the union "would ... like to represent the employees of the new company" and "would like to have an opportunity to discuss, perhaps negotiate" was not a sufficient request for recognition. 956 F.2d at 1229. The call was vague and nothing more than a suggestion. *Id.* at 1233.

 The facts of this case are different. Katz testified that he made a demand for recognition on behalf of the Union in early August. The ALJ credited his testimony. Katz also testified that when they met for lunch at the end of August he informed the Prime representatives of the Union's position that the company had to recognize Local 3. Katz further testified that the Union and Prime then discussed potential bargaining locations, and the subject of the transition from Clementina to Prime, which was about to occur. Substantial evidence thus supported the ALJ's and the Board's finding that the Union made a bargaining demand. The Union requested recognition, and the parties discussed bargaining locations and the subject of negotiation.

 We recognize the line of judicial authority holding that a bargaining demand is not required in cases—such as this one—in which there has been an immediate rather than a gradual transition period. *See Banknote Corp. of America v. NLRB,* 84 F.3d 637, 645–46 (2d Cir.1996). Whether this circumstance sufficiently distinguishes *Fall River,* 482 U.S. at 47, 107 S.Ct. 2225, and *Williams,* 956 F.2d at 1230, 1232–34, which required a bargaining demand in the context of gradual hiring during prolonged start-up periods, is an issue

about which we express no opinion in light of our agreement with the Board that the Union did make a bargaining demand.

### B. Substantial and Representative Complement

 Prime also challenges the ALJ's (and the Board's) finding that a substantial and representative complement of the workforce existed at the five California stores on August 28. In fixing the time for determining the composition of the successor's workforce, the "substantial and representative complement" rule reconciles the employees' interest in choosing a bargaining agent with their interest in being represented at the earliest possible time. *Fall River,* 482 U.S. at 47, 48 & n. 15, 107 S.Ct. 2225. "If, at this particular moment,"—the moment when a substantial and representative complement is on board—"a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees." *Id.* at 47, 107 S.Ct. 2225.

 Deciding when a substantial and representative complement existed can be difficult, particularly when the new employer has plans to expand or alter operations. *See Sullivan Indus. v. NLRB,* 957 F.2d 890, 895–96 (D.C.Cir.1992); *see also Pennsylvania Transformer Tech. v. NLRB,* 254 F.3d 217, 223 (D.C.Cir.2001). Here the matter is relatively simple. Prime was not rebuilding a moribund business and the ALJ properly refused to give weight to the company's unsupported assertions that it planned to expand the workforce. Prime was intent on having what it described as a "seamless transition." Appendix 65–66 (testimony of Roland M. Katz). When Prime took over the stores on August 28, it encountered a shortage of workers because several for-

mer Clementina employees had rejected their employment offers or had quit immediately. But the company quickly brought in new workers to fill the vacancies. Employing twelve of Clementina's seventeen former bargaining unit employees, it continued Clementina's full operations on August 28 without any hiatus. *See NLRB v. Cutter Dodge, Inc.,* 825 F.2d 1375, 1378 (9th Cir.1987). Prime itself wrote the Union on October 28 stating that its "substantial and representative complement of employees" consisted of eighteen workers, only one more than the contingent under Clementina. *See* Appendix 345. Substantial evidence therefore supported the ALJ's finding, adopted by the Board, that August 28 was the correct date for determining whether the successor had a majority of union members in its workforce. On that date a majority of Prime's employees were former Clementina employees. Prime was thus a successor employer obligated to recognize and bargain with the Union. The Board properly decided that the company's failure to do so violated sections 8(a)(1) and (a)(5) of the National Labor Relations Act.

## II.

 This brings us to Prime's motion to reopen the record. Prime asserts that regardless whether the Board correctly found it to be a successor employer, it still had no duty to bargain with the Union because new evidence showed that the Union lacked the support of unit employees. Prime asks this court to grant its motion to reopen the record pursuant to § 10(e) of the Act, 29 U.S.C. § 160(e), so that it can adduce petitions and letters signed by fifteen of twenty-six bargaining unit employees in April 2000 stating that they did not want to be represented by the Union. Section 10(e) provides that reviewing courts may order evidence to be taken before the Board if the party moving for

leave to adduce additional evidence shows "that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearings before the Board." *See NLRB v. Mexia Textile Mills, Inc.,* 339 U.S. 563, 569, 70 S.Ct. 833, 94 L.Ed. 1067 (1950). This information, according to Prime, gave it a good faith doubt about the Union's majority status.

 Once a successor employer develops a "good faith doubt" about a union's majority status, it is no longer obligated to recognize and bargain with the union. *Williams,* 956 F.2d at 1234; *see also St. Agnes Med. Ctr. v. NLRB,* 871 F.2d 137, 145 (D.C.Cir.1989). An anti-union petition signed by a majority of the successor's employees stating that they do not want to be represented by the union may serve to create such a good faith doubt. *See Williams,* 956 F.2d at 1234. But the Board has adopted a presumption—which this court has upheld—that an employer's unlawful refusal to bargain taints any later anti-union petition. *See Harter Tomato Prods. Co. v. NLRB,* 133 F.3d 934, 938–39 (D.C.Cir.1998); *see also Lee Lumber & Bldg. Material Corp. v. NLRB,* 117 F.3d 1454, 1458–61 (D.C.Cir.1997). An employer can rebut this presumption of taint only by showing : (1) that employee disaffection arose after it resumed recognition of the union; and (2) that it bargained with the union for a reasonable time without committing additional unfair labor practices. *See Harter Tomato,* 133 F.3d at 939.

 Prime did post a notice at some of its locations in compliance with the Board's order, but it never engaged in bargaining with the Union. The company canceled a bargaining session scheduled for April 13, 2000. Given these facts, Prime has not rebutted the Board's presumption that an

employer's unlawful refusal to bargain taints any later antiunion petition.

■ We reject Prime's argument that we should reopen the record so that it can demonstrate that at the time the Board issued the bargaining order (March 10, 2000) the Union no longer enjoyed majority status. If Prime had objected to the bargaining order it might have a point. We have held that before the Board issues a bargaining order on the basis of a union majority of authorization cards—a *Gissel* order, after *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)—the Board must take into account changes between the time of the unfair labor practices and the issuance of its order. *See Flamingo Hilton–Laughlin v. NLRB,* 148 F.3d 1166, 1170–71 (D.C.Cir. 1998). In mounting this argument Prime assumes that it may attack the bargaining order, an assumption we reject for the reasons given in the next section.

### III.

■ Prime argues that the Board erred in issuing the bargaining order without offering a reasoned explanation. This court has repeatedly held that the Board must supply a reasoned analysis for issuing a bargaining order rather than milder relief. *See Vincent Indus. Plastics, Inc. v. NLRB,* 209 F.3d 727, 738 (D.C.Cir.2000);

*Flamingo Hilton–Laughlin,* 148 F.3d at 1173. But Prime failed to raise any specific objections to the propriety of the bargaining order in the Board proceedings. It merely excepted to the remedy "in its entirety" and to the order "in its entirety." Appendix 350–52 (Exceptions of Respondent/Employer Prime Service, Inc. to the Administrative Law Judge's Decision). This form of generalized objection is insufficient to preserve the argument for appeal. *See Quazite Div. v. NLRB,* 87 F.3d 493, 497 (D.C.Cir.1996). Section 10(e) of the Act precludes reviewing courts from considering objections not first presented to the Board "unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances," 29 U.S.C. § 160(e), circumstances not present here. *See Exxel/Atmos, Inc. v. NLRB,* 147 F.3d 972, 978 (D.C.Cir.1998); *Quazite,* 87 F.3d at 497–98.

The petition for review and the motion to reopen are denied. The Board's cross-petition for enforcement is granted.

*So ordered.*